No. 12,929.

CHARLES F. JENKINS VS. MAGINNIS COTTON MILLS.

SYLLABUS.

Damages are claimed by plaintiff on the ground of defendant's negligence.

Plaintiff, a card grinder, had never before alone undertaken to remove flats on the endless chain of a carding machine. He *was sent by the overseer to do this work*, and was severely injured while at work.

There were safe ways, two at least, of removing the flats. They were the usual ways followed in removing them. Plaintiff chose the third manner of removing these flats, a manner unusual and very hazardous, in view of the fact, that the day before the accident, he, under the orders of the overseer, had removed the back plate and had stripped a fast revolving cylinder of its covering.

Plaintiff, having chosen the dangerous manner of removing the flats, under the circumstances, defendant is not responsible in damages.

An employe of mature years employed in a line of work who had assisted in another line of work, and is removed from the regular line and set to work on the latter without the presence and direction as previously of the overseer, and is injured while at work because of the unusual manner followed by him in doing the work, is without right to damages.

The danger was not unknown to the employee. It was plainly visible.

While an employer is expected to provide a safe place for his workmen and safe machinery, the employee should not unnecessarily expose himself to a visible danger.

The two cases cited by plaintiff require that employers shall exercise due care, and they were held responsible, as it appeared that the employee had no previous knowledge or acquaintance with the defective machinery causing the accident.

Lack of supervision of the factory (if there was such a lack) was not the proximate cause of the accident.


ON APPEAL from the Civil District Court for the Parish of Orleans. *King, J.*


*Clegg & Quintero* for Plaintiff and Appellant.


*Saml. L. Gilmore,* for Defendant and Appellee.


Argued and submitted March 9, 1899.
Opinion handed down April 3, 1899.
Rehearing refused, reasons assigned, May 1, 1899.

.On the Application for Rehearing by WATKINS, J.

The opinion of the court was delivered by

BREAUX, J.    This was an action by plaintiff, sounding in damages,. for the loss of a hand and forearm, while in the employment of defendant.

The following is a summary of the statement of plaintiff's petition. and of defendant's answer:

The petition sets forth that plaintiff was working at the Maginnis Cotton Mills as a card grinder; and that, under the overseer's order, out of his usual employment, he undertook to "mill a ring" in the carding machine, which machine was new, unusual, and dangerous, and that the work undertaken by him, under an order, as just stated, was the work of an overseer, as it required an expert workman in that line of work.   He alleges further that by the negligence of the overseer, a fly-plate, which protected the operatives on the card engine, had been removed.   That, in removing and in laying down flats, which he had been set to do by order of the overseer, his hand was caught and destroyed; that he suffered great pain in consequence.

Plaintiff complains also, of the lack of supervision in defendant's factory.

He claims damages in the sum of .ten, thousand dollars.

Defendant filed a plea of general denial, and specially denied that plaintiff suffered injury through its negligence or that of its overseers, agents or servants.   It also denies that plaintiff was required by them to do work out of plaintiff's usual employment.   It denies any act of negligence on its part, and specially alleges, in answer to plaintiff's charge of lack of supervision, that it had overseers enough for all purposes; and, further, that its machinery is the latest, safest and of most improved patents.

The following is a summary of the facts:

Plaintiff's hand was caught between the cylinder and the flats of a card machine which was running at the time, and it (the hand) together with the forearm, was mangled and lacerated, resulting in his losing his hand and forearm.

The machine by which plaintiff was injured was a Brooks-Doxey revolving flat card machine.

Grinding the card was the usual employment of plaintiff.

The occupation of plaintiff was not dangerous, as it consisted in

sharpening the steel points of a card, and· in repairing and resetting the card when it required repairing and resetting.

As to how the accident happened, plaintiff testified as follows:

"I was employed in the Maginnis Cotton Mills as a card grinder. On Wednesday evening, Lucas, the overseer, said he wanted to 'mill the ring' down on this card. We sat the milling machine on the card. Some of the flats of the machine had been taken off the evening before, the day preceding the accident. He directed me to let him know when the flats he desired to take up, would be up, and at a proper place in order to take them off himself." In the morning of the day of the accident, the witness called on the overseer and said to him that the flats were up and in the proper place for removal. He replied that he was quite busy, and directed plaintiff to go back to the machine and take off the flats himself at the place he indicated. Whereupon, plaintiff returned, and after two of the flats had been removed, his arm was caught between the flats and the cylinder. Plaintiff swears that "milling the ring" and "setting the flats" was the overseer's work.

He also said that he had been working three years and a half at the defendant's works, and since about two years, he ground the Brooks and Doxey cards. That he had nothing to do under his contract of employment with anything else. He also stated that he was standing at the time of the accident, on the outside of the frame of the machine.

It apears that the day preceding the accident, the fly plates had been removed by plaintiff, under the immediate direction of the overseer.

Ward, an ex-overseer of defendant, who was no longer in the service of the cotton mills on the day of the accident, testified that the removal of the plate rendered the machine dangerous; that it is not otherwise dangerous.

We are informed that in order to gauge the machine it is necessary to remove the flats and that these flats can be removed when the machine is in operation, as well as when it is still.

This ex-overseer, Ward, testified that whilst employed by defendant company, he did the setting of the milling machine himself; that the flats, under his direction, were taken off on the side of the mill, and usually plaintiff took off the flats for him, or he took them off himself, but that he was around while they were being taken off; that he always took them off while the machine was in motion.

"Milling a card," he said, was the work of an expert mechanic. A man not instructed in it could not do it.

Another witness, Charles Andell, a "card grinder," as was plaintiff, who was at one time employed at the Maginnis Cotton Mills, swears that he also sometimes took off the flats from the cylinder, but that he did not help to put in the mill apparatus, machinery, or to adjust it; that he took off the flats when the machine was stopped.

Richard, the superintendent in charge of the operations of the factory, swore that the one "milling the ring," or "setting the ring," cannot be hurt at all, if he be careful and cautious.

This witness testified that there is no danger in taking off the flats; that they are turned by hand by a proper appliance provided for the purpose; that plaintiff knew of this appliance. He also testified that while it is possible to take off the flats when the machine is running, he did not consider it safe either for the operator or the card; and that in removing a flat ordinarily, to do so safely, more especially if the machine be running, the operator or person directed to remove the flat should have an assistant; the removal should be done from the side and not from the back of the machine; that it would be always dangerous to undertake, as did the plaintiff, to remove it from the back, without assistance, if the mill was in operation.

As relates to the fly-plate, or back plate, which plaintiff asserts had been removed, the witness said that it is a plate at the back of the machine, placed there to regulate the amount of waste made by the card.

He also said that plaintiff had an assistant whenever he wanted to take off a flat. All he had to do was to give the order to get the assistant.

The superintendent also testified that plaintiff was a second hand, a "head grinder," a "sub-overseer;" that there was a superintendent at the factory who had control of the entire force; after him, six overseers, each in charge of a department. The next are the second hand or sub-officers; that in the room in which plaintiff worked, there were two second hands. One was the plaintiff, who had supervision of the card, and the other had charge of the frame, and under them were the ordinary employees who had no distinctive rank.

Lucas, who had charge as overseer when the accident happened, and assisted plaintiff in releasing himself from the grasp of the machine, swears that plaintiff was inside of the card between the frame and the

cylinder. He also swears that employees should not take off flats while the machine is running; that plaintiff had all the assistance he wanted, and that he could have called any one to take off the flats at any time.

He testified in the same line as the superintendent.

Another witness, Passmere, testified that plaintiff was not at the side of the machine at the time of the accident, but at the back of the machine; and that if plaintiff had asked his assistance in taking off the flats, he certainly would have given it; that he considered the machine very dangerous in the condition in which it was on the day of the accident and the day before, but that there would have been no danger if the card had been stopped before attempting to remove the flats; that it was the duty of the overseer to have the fly-plate put on, and that if he had ordered them put on, no one would have gotten hurt.

The remaining facts are embodied in our opinion.

Judgment was pronounced for defendant in the District Court. Plaintiff appeals.

The contention is, as we gather from the record, that the failure of the overseer to replace the fly-plate that had been taken off the day before the accident; the failure of the overseer to give due warning just prior to the accident, at the time that he directed plaintiff to repair to the card machine and take off the flats; and the failure of the defendant to provide for more complete supervision of the factory by employing another overseer in the place of one who had left a few days before, were the proximate causes of the injury.

On the other hand, the defendant contends that the fly-plate had been removed by the plaintiff himself, and that it was his duty to return the fly-plate where it belonged; that special notice of the overseer was not to be expected, as the plaintiff had been employed in the factory for more than two years as "head grinder," and that he must have known how to perform the work as directed, without exposing himself as he did; that posted notice was given him not to touch machinery while in motion; that, as "head grinder," he could have called an assistant and performed the work without exposing himself, or that he might have stopped the machine.

Whether plaintiff was doing expert work, out of the scope of his employment, presents one of the issues before us for decision.

It is evident, in our opinion, that the "overseer" and the "head

.grinder," (the position which the.plaintiff held), had respective duties to perform. There is evidence of record going to show that it was part of the work of the "head grinder" to take off the flats, while, on the other hand, there is evidence to the contrary. The evidence upon this point was not as full as it might have been.

The superintendent of defendant's mill swore that it is the part of the head grinder's work to "mill the ring," and that his duty is also to "grind the card," and "remove the flats." While this is denied by other witnesses, the superintendent's testimony does not stand alone. Taking into account the whole evidence on this point, we are of the opinion that this work was usually done by the overseer, assisted by the "head grinder," and that the latter was never left to do this work alone. We infer the orders of the overseer, just before the accident, were given from his office, instead, as theretofore, at the card machine itself, he intending, after the removal of the flats by plaintiff, to go to the machine himself and verify the gauge, or gauge the machine himself.

There were three ways, it appears, of carrying out the orders of the overseer; one was to call an assistant, stop the machine by transferring the belt from a fast to a loose pulley; an easy matter, it appears. In this there was no risk. The superintendent said that this was the usual way, or the rule at defendant's mill. After the machine is stopped with an appliance, by hands, the endless chain of flats is turned until the flats to be removed are on top of the chain of flats at a place where they are usually removed. There was no reason, as we appreciate the evidence, not to stop the machine. The stopping of the "milling of the ring" was of no moment, besides stopping would have been unavoidable to gauge, or set the cards, a work which was to be done by the overseer in a few minutes.

Another way is to stand on the side of the machine; the operative on one side, and his assistant on the other. We do not find, from the evidence, that there was any danger in removing flats save when the fly plate is removed; the back part of the machine is stripped and in motion. When the machine is in the condition last described, removal of the flats from the back is very hazardous.

We have not found that even skilled mechanics attempt to remove the flats from the rear of the machine, when the fly-plate is removed and the machine is stripped. In order to ascertain if ever mechanics removed flats when the machine is stripped and in operation, we read

the record with close and painstaking care, and did not find that such risks were taken. The record does not disclose why the unsafe manner of removing the flats was resorted to.

We have dwelt upon this point of the case—it has given us much concern—and several times we thought that plaintiff should recover damages if it appeared by the evidence that in meeting with an accident, he had only failed in exercising the skill exercised by others whom he had seen in the act of removing flats, or with whom he himself had removed flats. We have not found it possible from the record to conclude that he had failed in doing that which he had seen others do, for the method he adopted was not the only method of removing flats. Not having seen others remove flats from the rear of machines stripped and in motion, he was not lead into believing that he was safe in the attempt. His act is not sustained or defended by any preceding similar attempt made by any one. There were two methods of removing the flats, entirely safe. Plaintiff chose the third, although no one else ever, so far as the record discloses, made such an attempt; and, in the second place, the condition of the machine as brought on by his own manipulation (under the overseer's order, it is true), was entirely unsafe.

The rule applicable has a number of times been declared by the courts; it has always been held that it must appear in order to recover damages, that the employee did not know of the danger, or had no reason to know of the risk to which he was himself exposed.

We take it, that when a change is made in a machine, unusual and unknown in the ordinary use of the machine, plaintiff, an employee, called upon to operate the machine, should be notified of the change. If, however, the change is made by the employee himself, under orders, notice of the change is no longer necessary.

The question here arises: Should he have been notified of the increased danger? In the first place, the risk was visible; in the second place, as there were two safe ways of doing the work, each passed by by plaintiff, to adopt the third—an entirely unusual manner of removing flats—we find no warrant in disturbing the judgment.

This court said, in Carey, Tutrix, vs. Sellers, 41st Ann., 300: "To maintain an action by a servant against a master, two elements must concur, viz: fault or knowledge on the part of the master; innocence of fault or ignorance of the danger on the part of the servant."

We have read with close and careful attention the cited cases.

They do not do away with the rule that by knowledge of danger, a plaintiff accepts the increased risk, and, further, that one is without cause if his injury was proximately caused by his failure to adopt the course which a prudent man would have followed.

Even in the case of injury to a minor, in a well considered case, the Supreme Court of New Jersey held: "The danger, if it existed, was an obvious one. The plaintiff was familiar with the machine, and knew as well as any one else the danger to be apprehended from working it. The law is entirely settled that under such circumstances the servant takes upon himself the risks incident to the employment, and that no action will lie against the master for injuries to a servant in such cases." Citing 24th Atlantic, 487; 21 N. E. 717; and 113 Mass., 396. "Nor is the fact that plaintiff was a minor, material. He was 19 years of age—old enough to fully appreciate the danger of operating the machine, and, consequently, took upon himself the risk incident to his employment, the same as a person of mature years." Citing 12 N. E. 286.

Under the weight of judicial authority, an employer, properly, we think, is expected to concern himself about the safety of the place at which his workmen are employed, and the efficiency and good condition of the machinery placed in their hands.

We have read all the decisions upon the subject we could get, and have not found one carrying the rule as far as we would have to extend it, should we sustain plaintiff's demand.

Regarding our own, we carefully considered the cited case of James vs. Lumber Co., 50th Ann. 717, in which we find, quoting from the syllabus, covering the principles laid down in the decision:

"It is negligence on the part of a foreman to call on one of its employees suddenly to take a dangerous position, without warning him of the risk and hazard of the employment, with which the employee had neither a previous knowledge or acquaintance."

In the other cited case, Stucke vs. R. R. Co., 50th Ann. 189, we held in substance, that one cannot be understood as contracting to take upon himself risks which he neither knows nor suspects.

Here, we have found that the danger was visible, and that plaintiff had been at work on the machine of the factory since a number of years, and had, before then, taken off the pieces from the machine, in a manner not dangerous.

With reference to the lack of supervision, one of the complaints of

plaintiff, as we take it, it does not appear that the least fault was found before the accident, regarding the insufficiency of supervision of defendant's works. While it is true that one of the overseers had left a few weeks previous to the accident, and that the remaining overseer in charge of the works had succeeded to his duties, it does not appear that it was more than the latter could do. Plaintiff did not trace the cause of the accident to the fact that only one overseer had charge, where previously there were two. This would be a most remote cause, and not one for which it is possible to hold defendant liable for damages.

For reasons assigned, the judgment appealed from is affirmed.

MONROE, J., takes no part, as he was not a member of the court when the case was heard.

### ON APPLICATION FOR REHEARING.

WATKINS, J. The application is made solely on the ground that the court erred in finding the facts, in certain enumerated particulars, which are stated in the brief of complainant's counsel, from which we make the following extract, viz:

"And now into court comes the plaintiff, and moves the court to " grant a rehearing in this case, for the reasons hereafter assigned, " to-wit:

"1. Because the court has erred in finding the facts in this: It is " conceded that the plaintiff, Jenkins, was injured in the defendant's " mill, on the day stated in the petition, while in the performance of a " duty out of the line of his usual employment, specifically imposed " upon him at that moment by this special order of his master, and " under the master's eye. The specific order was to remove the flats " from a machine which had been rendered highly dangerous by a " change in its condition, by the order of the master. The changed " condition from one of safety to one of danger was known to the " master.

"The court finds as a matter of fact, that an unsafe manner was " resorted to and uses these expressions, namely:

" 'We have not found that even skilled mechanics attempt to remove " the flats from the rear of the machine when the fly-plate is removed " and the machine is stripped. In order to ascertain if ever me- " chanics removed flats when the machine is stripped and in operation, " we read the record with close and painstaking care, and did not find

"that such risks were taken. The record does not disclose why the "unsafe manner of removing the flats was resorted to.'

"Here the court has overlooked the fact, that, never in the history "of the mill was it attempted to remove a flat when the card was "stripped; when the fly-plate was gone. The situation was a new "one, never presented to Jenkins before, one created by the master, "the overseer, Lucas, existing within his view, under his immediate "supervision and control, and yet he ordered Jenkins to perform an "act out of his line of duty in connection with this machinery in this "novel situation.

"2. Because the court finds that there was adequate supervision "of the mill when every fact in the record points to a different con- "clusion, and the whole record is a mathematical demonstration to "the contrary.

"3. Because the court finds that there were safe ways of removing "the flats.

"There could be no safe way with the machinery in the condition "in which it was when Jenkins was sent to work upon it.

"4. Because it was *non sequitur* that if Jenkins stripped the ma- "chine the day before, under the orders of the overseer, and knew "that its condition had been changed; that, therefore, afterward, in "obedience to any order that the overseer might give, Jenkins as- "sumed any and all risks.

"Wherefore, the plaintiff now humbly prays that this Honorable "Court set aside its decree, and grant him a rehearing, and that the "former decree be reversed, and that there be judgment for the plain- "tiff, as in his petition prayed for."

The plaintiff was employed by the defendant as a card-grinder, and had been engaged at the defendant's works for about three and one-half years. Under his employment, he had nothing to do with anything else.

The fly-plates had been removed by the plaintiff on the day preceding the accident, and under the immediate direction of the overseer. He admits, as a witness, that he was standing at the time of the accident, on the outside of the frame of the machine.

The plaintiff was quite accustomed to removing the flats. Other card-grinders make similar statements. The plaintiff was a head-grinder, or sub-overseer, and was always furnished with an assistant when one was required.

The superintendent states that he assisted plaintiff from the grasp of the machine, after the accident happened, and that he was inside of the card-frame, and between the frame and the cylinder.

Another witness testified, that the plaintiff, at the time of the accident, was not at the side of the machine, but at the back of it, where he should not have been.

These, with other facts of the case, which are cited in our opinion, to say the least, put the plaintiff partially in fault.

He acted, in a great measure, upon his own judgment and responsibility.

Our investigation of this case has only served to reassure us of the correctness of the opinion at first entertained.

Our attention has, however, been arrested by what appears to us to be some very censorious observations which are contained in the brief of plaintiff's counsel, and amongst the number, are the following, viz:

"This Honorable Court has attempted, and it does in its opinion " seek, to exempt the company from the operation of this rule, and " from the performance of a plain, simple duty. There is nothing oc- " cult or mysterious about this rule. It is not unjust or unphilosoph- " ical; it is good and right, and universally applicable.

"To avoid the force of this, to find an avenue of escape for the de- " fendant, this court says that it has not found that skilled mechanics " attempt to remove flats from the machine when the fly plate is re- " moved and the machine is stripped." Brief on rehearing, p. 5.

Again:

"Will the court presume that a sane man, of ordinary endowments, " would deliberately thrust his right hand and forearm between re- " volving cylinders and flats clothed with steel wires, to have that hand " and forearm torn into a space of seven one-thousandths of an inch, " and shreaded as the cotton is carded?" Id. P. 6.

Again:

"The rule that a servant accepts the usual risks of his employment " is by the court in this case stretched to cover not only usual employ- " ment, but unusual employment; because, forsooth, they say, a skilled " mechanic would have known of the danger." Id. p. 8.

Again:

"So, then, to say that at this moment, that there was adequate super- " vision of this mill, is, as if one, standing under an August sky in the

" open sunlight, while all about him was bathed in the brilliancy of " the noonday sun, were to close his eyes and declare that there was no " evidence that the sun was shining." *Id. p. 9.*

While this court is, at all times, willing to accord the largest latitude—liberty, if you will—to the losing counsel in a cause, to be heard on briefs upon application for rehearing, and approve and applaud their earnestness and eloquence in argument; yet, it cannot permit them to pass the proper and legitimate bounds of criticism of its opinions.

Knowing counsel as well as we do, and taking cognizance of the pleasant relations they have always sustained to the court, we feel impressed with the belief, that the *censure* which is reasonably to be inferred from the foregoing remarks, was, rather, the expression of undue zeal in the cause of their client.

The friction thus brought about by counsel, is equally unfortunate for them and the court; but we feel disposed to pass the matter by, in the earnest hope and belief, that we shall have no occasion to mention the subject again.

Rehearing refused.

MONROE, J., takes no part, as he was not a member of the court when the case was submitted.