## VOLUME 124

## CASES ARGUED AND DECIDED IN THE SUPREME COURT OF LOUISIANA

AT TERM BEGINNING FIRST MONDAY OF OCTOBER, 1908
AND
AT TERM BEGINNING FIRST MONDAY OF OCTOBER, 1909

(49 South. 724.)

No. 17,423.

ALEXANDER v. DAVIS BROS. LUMBER CO., Limited.

(June 7, 1909.)

1. MASTER AND SERVANT (§ 217*)—INJURIES TO SERVANT—ASSUMPTION OF RISK.

The servant assumes the ordinary risks incident to his employment, and those of which he has actual knowledge, and he is chargeable with knowledge of risks which are obvious and of those of which he might acquire actual knowledge by the use of ordinary care; due allowance being made for youth, inexperience, and lack of intelligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.*]

2. MASTER AND SERVANT (§ 280*)—INJURY TO SERVANT—ASSUMPTION OF RISK.

Where, in a sawmill, the ends of two heavy planks become jammed beneath a revolving shaft in such a manner as to press against the shaft in juxtaposition to two cogwheels in plain view, the danger incurred by a workman, who, wearing gloves with flaring gauntlets, undertakes to dislodge the planks by so taking hold

of them that his gloves, or gauntlets, are brought in contact with the cogwheels, or with a set screw by which one of the wheels is fastened to the shaft, is an obvious one, which a workman of average intelligence must be considered to have assumed.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 982; Dec. Dig. § 280.*]

(Syllabus by the Court.)

Appeal from Fifth Judicial District Court, Parish of Jackson; George Wear, Judge.

Action by Henry H. Alexander against the Davis Brothers Lumber Company, Limited. Judgment for plaintiff, and defendant appeals. Reversed.

Barksdale & Barksdale and Stubbs, Russell & Theus, for appellant. Price, Roberts, Warren & Price and Clayton, Hawthorn & Atkinson, for appellee.

Statement of the Case.

MONROE, J. Plaintiff sues for damages for personal injuries sustained whilst in defendant's employ, and which, he alleges, re-

124 LA.—1

2

sulted from defendant's negligence. Defendant pleads the general issue, assumption of risk, and negligence on the part of plaintiff. The facts, as they appear from the evidence in the transcript, are as follows, to wit:

Plaintiff at the time of the accident out of which the suit arises was about 27 years old. His father had owned a sawmill of the old fashioned kind, where the work, apart from the sawing, was done mainly by hand, and, though plaintiff says that he had not worked in that particular mill, he states that he had been about it a good deal and had worked in other mills of similar character from his boyhood. He was employed by the defendant company, which apparently operates a modern mill, with the usual labor-saving devices, about 18 months before the accident in question; at first, at the dry kiln, from which at his own request he was removed to the cut off saw, and on the morning of the accident was set to work receiving lumber and strips as that material came from the edger, and also lumber which came from the "dixie" saw.

The edger is a machine consisting mainly of a band saw, from which projects a long table, with live rollers across its surface. The saw takes off the bark, edges, and strips, which are left from previous processes, and reduces the lumber to merchantable condition. The lumber in passing the saw is taken by the live rollers along the surface and length to the end of the table, from which point it crosses an aisle, and is taken further on by other rollers, the position of the "tailer" of the edger (to which plaintiff was assigned) being at the end of the edger table, and his function, with respect to the lumber, being to see that it is kept straight on the rollers of that table and reaches and is carried on by those upon the other side of the aisle; and his function (as we understand it) as to such strips, bark, and edges as come over the table being to drop them to the floor, where they are taken out of the build-

ing by automatic carriers, consisting of chains, which, at a distance of four or five feet apart, move along the floor transversely beneath the table towards the tailer's right. To the left of the table (considered from the position of the tailer) there is a space accessible from the aisle which is crossed, along the floor, by the carrier chains referred to, which chains also bring material from some other machine to the left of the passage. To the right of the edger table there is another space, perhaps six or eight feet in width, which is likwise crossed by the carrier chains (moving to the right, along the floor), and which space is also crossed at the level of the surface of the table by pieces of scantling, about, say, five feet apart, along the surface of which there are other carrier chains, moving in the direction of the table (or, to the left), whose function it is to bring certain lumber from the "dixie" saw (which is say 20 or 30 feet off to the right) and deposit it on the live rollers of the edger table, by which, in turn, it is disposed of in the same manner as the lumber coming from the edger.

There is some question developed by the testimony as to whether it is any part of the duty of the "tailer" of the edger to look out for the lumber thus arriving from the dixie saw prior to its landing on the edger table, or whether up to that point the duty of looking after such lumber devolves on the off bearer of the saw. Our conclusion is that, whilst plaintiff as tailer of the edger had no particular instructions upon the subject, he was not going out of his way in taking care of such lumber after it reached the point of crossing the space mentioned, since it was then nearer to him than to the off bearer of the saw. Further describing the situation, it appears that on the opposite side of the space to which we have last referred there is another table, standing parallel with the edger table, beneath which, about 20 inches from the floor, and running lengthwise of

the table, is a power shaft, upon which at a point near the aisle in which the tailer of the edger stands there is a cogwheel, about 5½ inches in diameter, geared upon another cogwheel, which latter is fastened upon another shaft running at right angles with the shaft first mentioned, and performing the function of driving the live rollers on the edger table. The cogwheel first mentioned has a collar or projecting circle of iron on the side (further away from the aisle) and is fastened to the shaft by means of two "set screws," which go through the collar to the shaft, and the heads of which, about five-eighths of an inch square, project above the collar, alongside of the wheel, but below its rim. The other wheel is fastened to the live roller shaft by a "key," or wedge of iron, which is driven between the wheel and the shaft, or, rather, into a groove cut in the shaft and running under the wheel. One may reach the two cogwheels in question by leaning over the scantling which bars the entrance from the aisle into the space between the edger table and the other, or, by going under the scantling, subject in the latter case, to the condition that there may be strips or edges or other debris moving along the floor on the carrier chains which cross the space.

In the afternoon of the day on which plaintiff was assigned to work as stated two planks, measuring 1 by 12 inches, 14 feet long, and 2 by 12 inches, 14 feet long, respectively, in coming from the dixie saw, became doubled (i. e. the one got on top the other) in crossing the space to the right of the edger table, and while in that condition were turned diagonally across the conveyor chains in such a way that the ends nearer the aisle dropped down between the scantling by which the chains are supported and became jammed under the shaft at a point quite near the cogwheels, the planks extending thence upward and backwards (diagonally), and resting on a piece of timber which runs lengthwise and supports the scantling, the greater portion of the planks, and hence the greater weight being on the far side (from the shaft) of the piece upon which the planks rested. A workman named Martin testifies that he offered to undertake to dislodge the planks, and that plaintiff said that Martin could take his place at the edger table while he dislodged the planks. Plaintiff testifies that Martin's offer was to take his place while he (plaintiff) dislodged the planks. However that may be, Martin took plaintiff's place and plaintiff attempted to dislodge the planks by taking hold of them near the ends that were under the shaft, a position of most obvious disadvantage, as it appears to us, and also of obvious danger, for the following reasons:

From the position of the planks, resting, as they did, upon the piece of timber to which we have referred, with one end under the shaft and near the floor, and perhaps two-thirds of their length extending upward and backward diagonally beyond the piece of timber, the leverage was on the far side (from the shaft) of the fulcrum, and, as newly sawed planks of the dimensions given are very heavy, the upward pressure against the shaft must have been great. On the other hand, plaintiff had the scantling over which he was leaning interposed between him and the planks, so that it was impossible for him to add the weight of his body to the strength of his hands for the purpose of bearing down on the planks, and (from the photographs which have been offered, in one of which a workman is represented in the position which plaintiff says that he occupied) it appears to us that the ends of the planks were so near to the cogwheels as to have rendered it impossible for him to have released them by merely pulling on them. Moreover, in thus leaning over the scantling and seizing the planks, as he did, upon their farther edges and quite near the ends, his arms, near the wrists, were against, or almost against, the revolving cogwheels, and, worst of all, he

was wearing a pair of gloves (of dog skin, or some such material) with gauntlets which flared out from the wrists, and which, it is conceded, were caught, either by the set screws, in the collar of the cogwheel nearest the planks, or, between the two cogwheels.

Plaintiff starts out with the theory that his glove was caught by the set screws, of the existence of which he says he was ignorant, but in the end he admits that how they were caught was a mere matter of surmise with him. Thus in answer to the question, "Your description of this accident is just what you have surmised since it happened?" he says, "Yes, sir."

To us looking at the photographs, the correctness of which seems to be admitted (in fact, in one of them, plaintiff, himself is present, and the workman referred to above is leaning over, showing, with plaintiff's sanction, the position occupied by the latter when the accident occurred), it appears rather more likely that the glove was caught between the cogwheels than by the set screw, or set screws, though it may be that the head of the set screw, which, as we have stated, is about five-eighths of an inch square, stands out from the side of the collar, and that the edge of the gauntlet was caught between.

Plaintiff testifies that he did not know that the set screws were there, and did not see them on the occasion of the accident. It appears, however, that not very long before the accident it became necessary to replace the key which fastened the other cogwheel to the roller shaft, and that plaintiff assisted the mill foreman in the job (in fact, it appears that he was always at hand, ready and willing to assist in repairs that were needed to the machinery), and, as the two wheels were geared together, it is difficult to understand how he could have seen the one without seeing the other, or how he could have seen the wheel in question without seeing the set screw, the more particularly as the fore-

man testifies that the key could not have been replaced in the other wheel without loosening the wheel which was fastened by the set screw. Beyond that it appears that there are two ways by which the cogwheels are fastened to shafts—the one way by the key, and the other by the set screw—and we do not understand plaintiff to deny that he was aware of that fact. And, again, it is shown by the testimony of several witnesses that, when the cogwheels are in motion, the set screws are more conspicuous than any other portion of the wheel because the cogs are in such juxtaposition that they run together, whilst, there being but two set screws, they serve as markers by which the revolutions of the wheel may be and were counted. It is admitted that, though plaintiff had not worked regularly at the edger prior to the day of the accident, he had on several occasions taken the places of men who were temporarily absent, and it is shown that "tailing" the edger "is about as safe a position as there is in the mill." There can be no doubt that the cogwheels and the set screws as well are in plain view, and plaintiff admits that he was attempting to dislodge the planks with full knowledge of the presence under his wrists and under the gauntlets of his gloves of the cogwheels, but, as we have said, he denies that he knew that the set screws were there or that he saw them when he took hold of the planks.

Some testimony was taken for the purpose (on the part of the plaintiff) of showing that the cogwheels in question might be boxed in, and thereby rendered less dangerous. Plaintiff expresses that opinion, but there are several witnesses who testify that such boxing as could be done would be likely to make the cogs more dangerous than they are now, the place in which they are situated being one where no one works, which is fenced in by the tables and scantling which have been mentioned, and where it is safer for those who may have to go there at times that the

wheels should be exposed to view. Defendant's foreman testifies that he regarded plaintiff as an intelligent man, experienced, though not skilled (in the sense that there were some positions that he could not fill). Being asked, "You were asked by Mr. Hawthorn if you warned him [plaintiff] about putting his hand in that place; please state why you did not," and he replied, "I didn't think it was necessary to warn a man like Mr. Alexander of anything of that sort. He would have taken it as an insult if I had."

Plaintiff lost the three middle fingers and most of the bones of his right hand, leaving only the thumb and little finger, and the latter considerably disabled. The case was tried in the district court before a jury which awarded $2,000, and the verdict was made the judgment of the court. Defendant has appealed, and plaintiff has answered, praying for an increase in the award.

### Opinion.

The injury sustained by plaintiff is most deplorable, and he is much to be sympathized with, the more so as the evidence shows him to be an excellent man, who was always ready to do his duty and even more, but we fail to discover in the facts presented by the transcript a basis of negligence in the defendant upon which to rest a judgment against it. The cogwheels by which the injury in question was inflicted as, also the set screws, to which plaintiff attaches part of the blame, were in open view, and it is idle to say that a man who has worked about sawmills for the greater part of a life of 27 years should be especially warned not to put his fingers between such wheels, or that a hanging sleeve or a loose glove may be caught therein with disastrous consequences to the wearer. If it be said that, though the cogwheels were obvious, the existence of set screws was unknown to plaintiff, the answer is found in the evidence, which shows that the set screws were as plainly visible as the cogwheels, that plaintiff had worked about the cogwheels under circumstances which authorized the inference that he had seen that which it would appear impossible for him not to have seen, and, apart from that means of actual knowledge, that he had worked about mill machinery enough to have known that the cogwheel in question was about as likely to be held in position by means of set screws as in any other way. The evidence, however, leaves it a matter of extreme doubt whether the set screws had anything to do with the accident; there being no testimony as to the manner in which plaintiff's glove was caught, save that of plaintiff himself, and he admitting that his testimony on that subject is based upon mere surmise. What we do know with certainty is that plaintiff leaned over the scantling which separates the aisle in which he stood from the space wherein the ends of the two heavy planks were jammed under the shaft, and seized the planks in such manner that his wrists and the flaring gauntlets of his gloves were in close juxtaposition, if not in actual contact, with the revolving cogwheels, a position which appears to us to have been one of great, obvious, and unnecessary danger. If it were quite as certain that he escaped that danger, and that his injury resulted from an independent cause—some hidden defect in the machinery, which was not only unknown to him, but which he could not reasonably be presumed to have known—he might still be entitled to recover, but he has not made it reasonably certain that he escaped the danger of having his glove caught originally in the cogwheels, and the alternative which he suggests—the danger from the set screws—was one with respect to which, even if not equally obvious to him at the moment, his experience, opportunities, and means of information were such that he must be presumed to have been informed.

The rule of law applicable to the case as

recognized by the courts and by the text writers may be stated as follows, to wit:

The servant assumes the ordinary risks incident to his employment and those of which he has actual knowledge, and he is chargeable with knowledge of those risks which are obvious and of those of which he might acquire actual knowledge by the use of ordinary care, due allowance being made for youth, inexperience, and lack of intelligence. 20 A. & E. Enc. of Law, p. 114; Beach on Contributory Negligence, 1, § 360; Bailey on Personal Injuries, § 640; Foley v. Pettee Machine Works, 149 Mass. 294, 21 N. E. 304, 4 L. R. A. 51; Jenkins v. Maginnis Cotton Mills, 51 La. Ann. 1011, 25 South. 643; Ramsey v. Tremont Lumber Co., 121 La. 506, 46 South. 608.

It is therefore ordered, adjudged, and decreed that the verdict and judgment appealed from be set aside and annulled, and that there now be judgment in favor of defendant rejecting plaintiff's demand and dismissing his suit, at his cost in both courts.