51 1775
119 577

## No. 13,162.

ED. DUNCAN VS. ST. LOUIS, IRON MOUNTAIN AND SOUTHERN RAILWAY COMPANY.

### SYLLABUS.

1. In an action in damages against a railroad company for loss of life by a brakeman, it must be alleged and proved that the injury was the result of the failure of the defendant to exercise that degree of care and diligence, for the protection of such brakeman, that their relations required.

2. The allegation that the death resulted from the derailing of the cars by reason of bad condition of track, consequent upon rotten crossties and missing spikes, is sufficient averment of negligence, but the failure to establish the truth thereof does not throw upon the defendant the burden of accounting for the accident.

APPEAL from the Fourth Judicial District Court for the Parish of Grant. *Machen, J.*

*Young & Whitelaw* and *W. C. Roberts,* for plaintiff and appellant.

*Hudson, Potts and Bernstein,* for the defendants and appellees.

Argued and submitted May 30, 1899.

Opinion handed down June 12, 1899.

Decree reversed, judgment amended and rehearing refused June 29, 1899.

The opinion of the court was delivered by

MONROE, J. Plaintiff as the surviving parent of James Duncan, claims $30,000, as damages, for the loss of the life of his son through the alleged negligence of the defendant, by whom the latter was employed as brakeman; the specific negligence charged consisting of a failure on the part of the defendant to provide a sufficient number of sound ties to hold the rails upon the track, as a result of which, it is alleged, that the track spread beneath the cars in the train upon which the said James Duncan was discharging his duties, and said cars were derailed, overturned, and wrecked, and said Duncan killed.

The evidence shows that plaintiff's son was employed by defendant as brakeman; that whilst he was in the discharge of his duties, upon a train going from Rochelle, or Little River, to Georgetown, in Grant parish, three of the cars in the train were derailed, overturned, and wrecked, and that he was crushed to death beneath them. The train consisted of fifteen or sixteen cars, of which about half, being those in front, were empty, flat cars, and the other half, being those constituting the rear of the train, were box cars, some, if not all, of which were loaded. The speed of the train, at the time of the accident, was about twelve miles an hour, the track, at the place where the wreck occurred, was straight, the road-bed level, and filled about twenty inches, the weather was fine, the time at which the accident occurred was about half past ten o'clock on the morning of April 19th, 1897, and the point at which it occurred, was about one and a quarter, or one and a half, miles south of Little River, being nearly midway between that station and Georgetown. The section foreman and hands who were at Little River, arrived upon the scene, as did also some persons from the neighborhood, within half an hour. The roadmaster, who was at Georgetown, reached the spot about fifteen minutes later. The track was cleared within about two hours, the engine, which had not been

derailed, coupled on to the cars which had remained on the track—some twelve or fourteen in number—and moved them away, and the question of the cause of the accident is left for determination.

The petition sets forth that the ties were rotten, the spikes consequently loosened, insecure in their holdings, or out entirely, the rails, therefore, without sufficient support, and that, as a matter of fact, the cars were derailed by reason of the spreading of the track, resulting from these conditions.   The question to be determined is therefore narrowed down, primarily, to the single issue, were the cars derailed by reason of the spreading of the track?

Matthews, a witness for the plaintiff, testifies that he reached the scene with the section foreman, twenty-five or thirty minutes after the accident, and before anything had been done toward clearing away the track or removing the wreck, that one rail was bent in the middle, perhaps a foot out of line, and was two feet off the track, except at one end which rested on the ties, but had no spikes in it; and that the other rail was torn loose from its fastenings.  He says that he has no experience in railroad work, except getting out ties, but is very positive in the opinion that the wreck was caused by rotten ties and loose, or missing, spikes.  He also testifies that there were a number of persons present, including the section foreman, Tully, and that they all saw the condition as he described it.

This witness is a young man, twenty-two years of age, who also testifies that some three days before the accident in question he passed over the *locus in quo* on a hand car, with two of the section hands, and that at the exact spot where the accident subsequently occurred, the hand car was derailed by reason of the spreading of the track, and ran along between the rails; that he and his companions consumed less than five minutes in replacing the handcar, and went on their way; that he never mentioned the circumstance to the foreman of the section or to anyone else, except at home; that he did not mention it at the discussion which took place at the scene of the accident, as to the cause which had brought it about, either to the foreman or to anyone else, and that he was unable to remember the names of the men who were with him on the hand-car, but knew that they had gone away.  Later on, he recalled the name of one of them, as Gilmore, but was in error in stating where he could be found.  This testimony was given on the trial, before the jury.  Gilmore's testimony had previously been taken under commission, but, as nothing appears to

have been known about the hand-car incident, until Matthews testified upon the subject, Gilmore had not been interrogated concerning it. He, Gilmore, however, testifies that he reached the scene of the accident about twenty minutes after it occurrred, being one of the laborers, or section hands, and assisted in clearing away the wreck; that the track was in good order when the accident occurred, and that "he only observed a few ties that were a little rotten at the ends, but not enough to hurt anything." In answer to the interrogatory: "Did the rails spread where the wreck occurred," he says: "No." In answer to the cross interrogatory: "If you state that the ties and track were in good condition at and before the wreck occurred, please explain why it was necessary for you to go to this point and make any repairs after the wreck occurred?" he says, "The track was damaged by pulling cars off the track in clearing the wreck." In answer to the cross interrogatory: "Did you ever have any occasion to notice this spot at any other time in your life except when you went there to repair the wreck," he says: "No, never did."

The evidence shows without contradiction, that there were two passenger trains and ten freight trains passing over the road every day, so that, between the time of the hand-car incident and the accident out of which this suit has arisen, between thirty and forty trains must have passed over the point where the track is said to have spread beneath the weight of the hand-car. It further appears, that the hand-car could easily be lifted by four men, whilst the locomotives, drawing the trains referred to, probably weigh forty tons, the weight of the passenger and freight cars not being given. It further appears that Matthews lived within seventy-five or a hundred yards of the road and knew that it was constantly used by passenger and freight trains.

Under these circumstances, it would be more charitable to believe that the hand-car incident, as related by him, never took place. We might understand that three men could deliberately plan the derailment of a train, for purposes of robbery or of revenge. But that any three men can be found, met together without purpose or design, who would be willing to keep to themselves, knowledge of a misplaced rail, on a track used daily and almost hourly for the transportation of human beings, seems incredible. And all the more so when it appears that two out of three are said to have been persons whose duty it was, by reason of their employment, to make the road safe.

Nor does it seem to us to accord with probability that, when the

accident occurred which cost Duncan his life, and Matthews and Gilmore and Tully, the foreman, (with whom Matthews went to the scene of the wreck), were upon the spot, and Matthews recognized it as the identical place at which he and Gilmore had been derailed, upon the hand-car, only three days before, not a syllable should have been uttered by him upon the subject. And more remarkable still, perhaps, is the fact that thirty or forty trains should have been able, in the meanwhile, to pass in safety over a track which had spread beneath a weight which four men could easily lift.

Another witness for plaintiff is R. J. Bruce, an uncle of Matthews. He testifies that he has nothing, is doing nothing, and has been so engaged "all this year." He reached the scene of the wreck about two hours afterwards and remained there as a looker on, until the track was cleared. He says that there were rotten ties at the place where the wreck occurred, and that the north end of a rail on the east side of the track was moved out, and that "the rail was crooked some and twisted;" and that new ties and another rail were put in before the cars were allowed to pass over the track. He also says that he did not examine the track closely, and could not say what caused the wreck.

Mr. Price, another witness for plaintiff, testifies that, in his opinion, the road, about where the wreck occurred, was in a bad condition; that he would say that about one fourth of the ties were rotten and that there were, along there, several "O out," or rejected, ties in the track, and he explains that such ties are rejected and not paid for by the railroad company, because they are too small, or rotten, or are "winding," or not hewed straight. He further gives it as his opinion that a road may be perfectly safe with one-fourth of the ties rotten, if the rotten ties are not collected together, but says that he knows nothing about the construction or maintenance of a railroad, and does not consider himself competent to judge whether a road is good or bad. He also says that the "O out" ties which he noticed in the roadbed were ties which he had tendered to the defendant, and which had been rejected and not paid for, and that he considered them good when he tendered them. In answer to the question (referring to the condition just after the wreck) "did you see where the rails were spread any?" he says: "If my memory serves me right, one end of one of the rails was knocked out of place," but he says that he had no interest in paying any attention to the wreck.

De Haven, the engineer, who was in charge of the locomotive of the wrecked train, testifies that the ties at the place where the wreck occurred, were sound, that they did not take any out that he knew of, and that he supposes they put in two or three, or half a dozen, new ones. He also says that the rail on the right hand side was bent, and that they put in one new rail. On being asked, however, "are you positive that a new rail was put in at this wreck on the day of the wreck," he says: "I am not positive, but I know they put in some iron. They took out some iron in order to put down more ties." He says further that he does not know what caused the wreck, that the track was in perfect order when the engine passed over it, and that the ties were sound where the cars left the track.

As against the testimony of these witnesses, which is about all that we find in the record favorable to the plaintiff's view of the case, we find that of Bird, a citizen living near by, Pearson, the conductor, Bolen, the fireman, Tully, the foreman of the section, with Gilmore and Slover, members of his crew, all of whom were on the spot when the accident occurred, or else reached there within half an hour. We have also the testimony of Thornton, the road-master, who reached the scene a few minutes later than Tully; and Lally, the train-master, who, with Yowell, Miller, De Priest, and Rogers, reached there the next morning. We find also the testimony of W. M. Tully, in regard to the character of the road.

From this it appears that it was the particular business of Tully, as foreman of the section upon which the accident occurred, and of Thornton, as road-master, to clear the road, in order that traffic might be resumed with as little delay as possible, and also carefully to investigate and report upon the causes of the wreck. Lally, as train-master, had a general supervision of the rolling stock, and perhaps of the road, which imposed upon him the obligation of removing or providing for the wrecked cars, which it was the business of Thornton and Tully to get off the track. Yowell was foreman of the wreckers, with his crew, consisting of De Priest, Miller, and Rogers, car repairers.

Pearson, the conductor, Bolen, the fireman, Bird, Tully, Gilmore, Slover, and Thornton, all testify positively that the track had not spread, and that when the damaged cars were removed, the engine, which had never left the track, passed over the place from which the flat cars had been derailed, and was coupled to the cars on the other

side; that no new ties or rails were put in that day, but that, some four or five days afterwards, a few new ties were put in, and another rail was substituted for one of those which was in the track, for the reason that the latter had been bent in pulling the wreck off the track with the locomotive. These witnesses vary a little as to what was done, or whether anything was done to the track after the removal of the wrecked cars and before the locomotive passed over.

Thorton was the ranking and responsible official on the spot; he says:

"I was about a mile south of where the wreck occurred. Well I went there immediately to the wreck, and commenced clearing the track. In clearing the track, I bent a rail a little, in clearing those broken cars off the track, so we could get the track clear for traffic as quick as possible. There was no need of bending that rail or of breaking these ties, if I had taken time to do so, but I was in a hurry to get the track clear—and, how the ends of those ties got broken—they got fast with the trucks of the cars and bunched the ties. That was the cause of the rail bending and breaking part of the ends of the ties off. * * *

"Q. Well now, after you removed the wreck of the cars from the track state what you did to the track before a train ran over it?

"A. Well there was but three or four ties bunched. I cleared the dirt out from between those ties, and placed them back where they belonged. Then all trains ran over it. That was all I done.

"Q. Did you remove any ties from the track.

"A. No, sir; not that day.

"Q. Did you place any new ties in the track at all?

"A. No, sir.

"Q. At that point?

"A. No, sir; at that point.

"Q. How many trains ran over that track before any new ties were placed in it?

"A. To the best of my information, I had the foreman to place some ties in there about four or five days after the wreck, and during that period, there must have been forty or fifty trains that passed over that part of the road. * * *

"Q. Did you place any new rails in that part of the track before any trains passed over it?

"A. No, sir.

"Q.  Did you place any there at all, and if so, why and when?

"A.  About the time I put in those ties, about four or five days after the wreck.

"Q.  Why?

"A.  Well I told the section foreman, Tully, that the superintendent would be down in a few days, and that he had better take out those four or five ties that had the ends torn off, and the bent rail. I did not want the superintendent to see it, it would look bad."

He also testified that he critically examined the place at which the cars left the track, and that the ties were perfectly sound; that the rails were in position, and that the wheels upon one side had jumped over the rail and for a distance of thirty-five feet, the flanges of the wheels of the derailed car, or cars, had cut deep marks in the ties, the marks being upon the out-side of the one rail and upon the inside of the other, corresponding with the position of the wheels of the cars.

This testimony is absolutely corroborated by Tully, the section foreman, and is corroborated, in the main and essential particulars, by Bird, Pearson, Gilmore, and Slover, all of whom testify positively that the track was not spread. Lally, the train-master, testified that he went there for the purpose of investigating the cause of the wreck, that he found where the cars first got off the track by the marks made by the flanges of the wheels in the crossties, which marks ran for thirty-five feet on the outside of one rail and on the inside of [the] other.

W. M. Tully testifies that he had been foreman of that section about eighteen months before and had devoted a year to renewing the ties between Little River and Georgetown, and that the road was in good order.

The testimony of Yowell, De Priest, Rogers and Miller, constituting the wrecking crew which arrived next morning and took charge of the wrecked cars, is, in general, that as far as they observed, the track was in good condition.

And this is a fair summary of all the pertinent testimony in the case.

That given by plaintiff's witness, Gentry, hardly bears upon the point at issue. It is not surprising that during his employment, as section hand, his attention should have been attracted to the rotten ties, since the repair of the road

FIFTY-FIRST ANNUAL REPORTS, 1899.          1783·

Duncan vs. St. Louis, Iron Mountain & Southern R. R. Co.

required the removal of ties of that character and not of sound ties. And, whilst his evidence shows that there were rotten ties to be removed, it also shows that the defendant had a gang of men regularly engaged in that work, and in this particular the testimony of Gentry is corroborated by that of Price, who furnished ties, and of the two Tullys, and others; so that, considering that the road was not more than six or seven years old, it would seem to have been moderately well looked after. Mr. Gentry's opinion as to its safety, in view of his frank statement that he did not know enough about railroads to give an opinion, might have been omitted without prejudice to the record.

The testimony of the witness Matthews, we think, for the reasons which have been given, proves too much. Bruce is careful to state, with regard to the misplaced rail which attracted his attention, that the north end of it seemed to be pushed out, and that it was bent, but as we understand him, the south end remained in position. As the train was moving south, the fact that the north end of the rail was pushed out would not seem likely to derail a car, since the rest of the rail, with the south end in position would remain as a guide until the next rail is reached. There are, however, possibilities of all kinds in such cases and we leave this testimony without further comment.

Upon the immediate question of fact—were the rails spread at the point where the wreck occurred? by far the greater number of witnesses testify in the negative. They, and the witnesses who testified in the affirmative, were heard by the jury and the judge in the court a qua, and both jury and judge seem to have accepted the version of those who testified in the negative. We can only say that the evidence which we find in the record does not lead us to a different conclusion. The witnesses for the defense being more numerous, and, as far as we have been able to judge, at least as worthy of belief as those of the plaintiff, there are no circumstances disclosed which would justify a conclusion adverse to that which this preponderance of evidence sustains.

It is true that the defendant does not account for the accident, save by theories propounded by one or two of the witnesses, but it was not, in the case presented, bound to do so, whatever might have been its obligation, had the person injured been a passenger, or perishable freight, instead of an employe. A brakeman accepts the risks incident to his employment and is not insured against them by his em-

Duncan vs. St. Louis, Iron Mountain & Southern R. R. Co.

ployer. One of these risks lies in the possibility that the train upon which he is working may be derailed under conditions which can-not be forseen or guarded against by the exercise of reasonable care and diligence. There is nothing in his relation to his employer, which relieves him of the obligation, of alleging and proving, as a condition precedent to the recovery of damages, not only that he has been injured, but that he has been injured through his employer's negligence, that is to say, through the failure of his employer to exercise that degree of care and diligence for his protection which their relations require. The plaintiff in this case made that necessary allegation, for there is no doubt that a railroad company is bound, as well to its employes as to passengers, to keep its road-bed and track in good condition, but there has been a failure in the proof. And this case differs from those to which we have been referred in that respect.

In Rutherford vs. Railroad Co., 41 Ann., 793, this court said:

"The evidence shows to our entire satisfaction that the accident was the result of a defective condition of the road at the point where the accident occurred, owing to the rotten condition of the cross ties," etc., etc.

And so, in McFee vs. Railroad Co., 42 Ann., 795, the report of the conductor to his superior officers, which was called for and filed in evidence, stated the cause of the accident to be "Bad track, rotten cross ties, and chair off rail."

And this court said:

"An analysis of the testimony has resulted in convincing us that the answer in the conductor's accident report is correct, etc., etc. It is corroborated as to its correctness by a decided preponderance of testimony."

We have no such report before us, and we find that the preponderance of testimony negatives the charge that the accident, in the instant case, was caused by bad track or rotten ties.

The judgment appeal from must therefore be affirmed.

ON APPLICATION FOR REHEARING.

In this case, a careful review of the evidence, and a reconsideration of those facts which are undisputed, has led us to the conclusion that the plaintiff ought to be allowed a further opportunity to establish the claim which he makes, and that the judgment of this court should be one of non-suit, rather than a final judgment re-

jecting the demand. We deem it unnecesssary, however, to grant a rehearing in order to effect this change.

It is therefore ordered, adjudged and decreed, that the judgment heretofore rendered in this case be set aside, and that there be now judgment amending the judgment appealed from in so far as to order that plaintiff's demand be rejected as in case of non-suit.

It is further ordered and decreed that in all other respects said judgment be affirmed, the costs of the appeal to be borne by the defendant and appellee.

Rehearing refused.