(38 South. 684.)

No. 15,443.

MOSES et al. v. GRANT LUMBER CO., Limited.*

(March 27, 1905.)

INJURY TO SERVANT—DANGEROUS APPLIANCES —ASSUMPTION OF RISK.

1. The master is liable for the consequences of his negligence in failing to furnish the servant with reasonably safe appliances for the performance of the work to which he is assigned.

*Rehearing denied June 5, 1905.

2. A "slab tripper" in a sawmill does not, by virtue of his employment, assume the risk of the danger to which he may be exposed by reason of the use of defective "dogs" for the holding of logs on the carriage.

(Syllabus by the Court.)

Appeal from Thirteenth Judicial District Court, Parish of Grant; Wilbur Fisk Blackman, Judge.

Action by David and Mary Moses against the Grant Lumber Company, Limited. Judgment for plaintiffs, and defendant appeals. Affirmed.

Stubbs & Russell and E. Tyler Lamkin, for appellant. John C. Ryan, Allen Byber Hundley, and G. Purnell Whittington, for appellees.

MONROE, J. This is an action in damages, brought by the parents of a young man who lost his life, whilst in the defendant's service, through the negligence, as the plaintiffs allege, of the defendant, in failing to furnish the decedent with safe and suitable appliances for the work to which he was assigned. The defendant denies the negligence imputed to it, and alleges that the decedent assumed the risk of his employment, including the negligence of a fellow servant, who, if any one, was the person to blame for the accident. The facts disclosed by the record are as follows:

William F. Moses, the son of the plaintiffs, about 22 years of age, residing with his parents, and contributing from $15 to $25 a month, irregularly, to their support, was employed by the defendant as "slab tripper"; that is to say, he stood near the side of a carriage, or carrier, upon which logs were held whilst being sawed into lumber, and removed the slabs, or outside pieces, as they were cut off by the saw—a work in which he had had sufficient experience to enable him to appreciate the dangers ordinarily incident thereto. Upon the carriage were three "knees," or upright pieces,

possibly 12 or 14 feet apart, connected with which were appliances known as "dogs," controlled by levers in the hands of workmen known as "doggers." The dogs are made of iron, fashioned like claws, and, when in proper condition and properly controlled, should close upon the logs and hold them securely against the knees, it being a matter of the utmost importance that the logs, whilst being sawed, should be allowed no lateral motion, and the danger of their acquiring such motion or rolling lying in the possibility either that the dogs may be defective or that the doggers may not bear down with sufficient force upon the levers. Upon the morning of June 23, 1903, whilst an attempt was being made with the saw by which young Moses was injured to cut into lumber a log measuring six or eight inches in diameter, which had been placed in position for that purpose, the log escaped from the dogs, and was thrown by the saw out into the millyard. It is said by way of explanation, but it is not proved, that the diameter of the log was insufficient to permit the dogs to grasp it. Later in the day an ordinary pine log, 16 or 18 feet long, and about as many inches in diameter, was placed on the carriage, apparently within the grasp of two of the dogs (it not being long enough to reach the third), and it was sawed to within 18 or 20 inches of the end, when it rolled, or moved laterally, in some way, with the result that the saw burst in pieces, and one piece cleft the skull and brain of young Moses, inflicting a wound from which he was rendered unconscious, and, without recovering consciousness, died on June 27th. It is abundantly proved that the "front dog" (as it is called by the witnesses) did not take hold of the log at all, and that the "hind dog" held it but lightly; in fact, there is no witness who undertakes to deny that this was the case. K. H. Cooley, the only witness examined in the case (save the plaintiff David Moses), who was not, at the time of the trial, in the employ of the defendant, was so employed when the accident occurred, and it appears to have been part of his duty to put the dogs in order; that is to say, to sharpen, or straighten, or replace the iron teeth or claws. He gives the following, with other, testimony, to wit:

"Q. Were there any scratches or signs on the log to show whether or not the log had been fastened by the dogs on the carriage? A. No, sir; there was not any. There was no signs on the log except at one place. That was the hind dog caught the log lightly. The front dog never entered the wood." (It may be stated here that the terms "front dog" and "hind dog," as used by the witness, refer to the positions of the dogs with reference to the log; the dogs mentioned, considered with reference to their positions on the carriage, being the "front dog" and "middle dog"; the "hind dog," on the carriage not having been reached by the log.) "Q. Had it made an impression or imprint on the log—on the bark? A. Really, another man or two examined that part to see why it didn't catch. We found that there was only one tooth of the back dogs that caught the log, very lightly. Q. Was that the upper or lower tooth? A. I think it was the upper tooth. * * * Q. Mr. Cooley, do you know the condition of that carriage and those dogs at the time this accident occurred? If, so, just explain to the jury. A. Well, of course, I couldn't say I know exactly the condition of it right at that time. It was an old carriage they had been using there for some time, or, as to that matter, we used it for quite a time afterwards, and made lots of lumber. The dogs were getting kind o' old, and we kept them kind o' repaired up; something like that, working on them frequently, all the time, keeping them in pretty good shape. When the points would break, or something like that, we would have to mend them. The dogs were kind o' getting old. * * * Q. Was that carriage and those dogs in first-class condition at the time the accident occurred? (Objection sustained as to inquiry about carriage.) Plaintiff's Counsel: Well, we will confine it to the dogs. A. Well, right at that particular time, I couldn't say, * * * the condition of the dogs. I didn't examine the condition of the dogs very closely. I paid but little attention to the front dog, and found that there was one tooth bent. It wouldn't have caught at all. I don't think, if the log had been right up close to it. As far as the other part of it, I don't know how long it had been since I had worked on it. You know those dogs get a tooth worn, and they have to be sharpened. They all do that I ever had anything to do with; and we had been working on them all the

time. Right at that particular time I had not been in the shop for a couple of months. There was some complaint of the dogs not holding. Q. Prior to this accident? A. All the way through, as long as we used the carriage. * * * Q. You stated just now, Mr. Cooley, that complaints had been made concerning the condition of those dogs at different times. Just state to whom that complaint was made. (Objection and ruling.) A. Well, it was just the general talk among them. It was made to me, lots of times, during the winter when I was working round the mill at night. They would get caught in the logs, and logs would turn over on them, and they would come to me; and I worked on them, off and on, all the time I stayed there. The points turned sometimes, and got out of set, and wouldn't hold the logs, and would let the logs turn. * * * Q. Now, what is the smallest size log those dogs, if they had been in good condition, would have held in the carriage? A. Well, sir, I think, if those had been in good condition, the same as any other dogs on any other carriage of that kind, they would have held any sized logs that wouldn't [would] have measured over four inches in diameter. That's what I think about it. I don't see why it wouldn't. * * *" Cross-examination: "Q. When were those complaints made about those dogs, before or after the accident? A. Well, sir, there have been complaints made about those dogs ever since I have been working for the Grant Lumber Company. They would, now and then, get in bad shape, and they would be kicking about it. I worked on them dogs there along during the winter. There was never a day, or twenty-four hours, that I didn't do some work on the dogs, or set brakes, or something. * * * Q. Have you ever seen any dogs, in sawmills, of course, that wouldn't let loose sometimes? A. I don't know that I ever did. I never paid any attention. I know one thing: if the dogs is in proper condition, and is properly dogged, it is forced to hold."

A witness for the defendant (the sawyer in charge at the moment of the accident) gives the following, with other, testimony:

"Q. Mr. Gaines, did you notice anything as to the actions of the man, the rear dogger, about the time the saw passed the rear dog? A. Well, sir, I sort o' got a glance at him, and it looked to me he let up a little on his dog. When he first taken hold of the log it held pretty solid, until it got nearly through, and then he lightened up a little bit. Seemed to me when he lightened up the log turned. Q. You could see him? A. Yes, sir. Q. And that was the impression made on you, that, as the log got opposite the rear dog, he let up? A. Yes, sir; let up some."

The rear dogger referred to testifies as follows:

"Q. Did you dog, or attempt to dog, the log? A. Yes, sir. Q. That the saw was passing through at the time of the accident? A. Yes, sir; I dogged it, and pulled down on it all I could. Q. How many efforts did you make to dog that log? A. I just pulled when it was put on the carriage. I pulled down on it. I was pulling down on it all the time. I didn't make but one effort, and that was all the time. Q. Well, just explain to the jury whether or not those dogs were in good condition, and whether they caught that log, or whether they did not. A. Well, I just pulled all I knowed, but the log on the carriage—but the front dog had no hold on the log at all. * * * Q. Mr. Lewis, were those dogs in good or bad condition? A. I don't know how they were. I just know they didn't hold that log. As far as the dogs were concerned, I didn't dog. I was just in a fellow's place. I hadn't been on there long enough to know what condition the dogs were in."

The record contains no suggestion that the front dogger did not do his work properly. It is shown that the log in question had two "cat faces" on it (i. e., scars), and some of the witnesses suggest that it turned and broke the saw when one of them was reached. It is not, however, suggested that a "cat face" should prevent a good dog from holding the log upon which it is found. Taking all the testimony together, our conclusion as to the fact is that the accident was caused by the negligence of the defendant, and that the damage was one the risk of which was not assumed by the unfortunate slab tripper.

Under the law and the well-settled jurisprudence of this state and country, the defendant is liable.

There was a verdict and judgment in the court a qua in favor of plaintiffs in the sum of $4,500. The defendant does not contest the amount. The plaintiffs ask that it be increased. The circumstances do not justify a compliance with this request.

Judgment affirmed.