PER CURIAM. Applications for rehearing are not entertained on refusal of writs of review.

(42 South. 421.)

No. 16,086.

### JOHNSON v. CHRISTIE & LOWE et al.

(Nov. 12, 1906.  Rehearing Denied Dec. 10, 1906.)

1. MASTER AND SERVANT—INJURIES TO SERVANT—SAFE PLACE TO WORK.

The master is bound to furnish the servant with a reasonably safe place and with reasonably safe appliances in and with which to do the work assigned to him, and where, by reason of his failure in those respects, or by reason of such failure, combined with the negligence of another employé, the servant sustains injury, the master is liable.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 171, 173, 178–180.]

2. SAME—ASSUMPTION OF RISK.

Where the defense relied on is the assumption by the servant of the risk to which he was subjected, it must appear, with reasonable certainty, either that he was specifically informed of such risk, or that it was so obvious as that it could not have escaped his attention, due regard being had for his intelligence and opportunities.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 574–600.]

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; George Henry Théard, Judge.

Action by Alex. Johnson against Christie & Lowe and others. Judgment for defendants and plaintiff appeals. Reversed and rendered in favor of plaintiff.

Clegg & Quintero and Louis A. Hubert, for appellant. Rice & Montgomery, for appellees.

### Statement of the Case.

MONROE, J.  Plaintiff sues for damages for personal injury received through the alleged negligence of defendants whilst discharging a duty assigned to him as their employé.  Defendants deny the negligence imputed to them, and aver that the injury complained of is the result of plaintiff's own want of care with respect to a danger which was, or should have been, known to him. The case presented by the testimony in the record is as follows, to wit: Defendants are contractors, engaged in building the jetties at Southwest Pass (of the Mississippi river), and when the accident out of which the suit arises occurred were receiving large quantities of stone on the bank of the river, above New Orleans, and conveying it thence, in barges, to the scene of their operations.  The stone was brought from the quarry in uncovered cars, the beds of which (like wagon beds) consist of the bottoms (or surfaces) of the cars, around the edges of which are erected sides and ends about four feet high, supported by stanchions.  In order to facilitate unloading, these sides are so divided that the spaces between the stanchions are practically gates, which, being hinged at the tops, may be made to swing out from the bottoms, and, when closed, are secured by means of clutches, fastened upon iron rods, an inch and a quarter in diameter, which, in turn, are braced along, and a few inches off from, the sides of the cars.  The railroad company delivered these cars on its track at a point near the river bank, from which de-

fendants had constructed a spur track, across the bank and the wharf, against which latter the barges were moored, the length of the spur being about 250 or 300 feet, and the method of handling the cars over it being as follows: Defendants had established on the lower side of the spur, about three feet distant from it and about 60 feet from the outer edge of the wharf, a stationary engine, with two drums, around which were wound steel ropes, say seven-eighths of an inch in diameter. One drum (with its rope) was used to pull the loaded cars from the starting point to within a short distance of the engine and give it the momentum necessary to send it on to the outer edge of the wharf, and the other was used to pull the cars, after being unloaded, back from the wharf's edge and give it the momentum necessary to send it into a switch, which branched off from the spur, between the wharf's edge and the main track. In order to accomplish this manœuvre, so far as the loaded cars were concerned, the steel rope was attached to the iron rod, to which we have referred, at a point near the rear end (the farthest from the river) of the car, by means of a hook fastened to the end of the rope, so that, when the engine was set in motion—revolving the drum and winding the rope—the hook found a purchase against the nearest forward stanchion, and the car was carried, by traction, usually at a speed of four or five miles an hour, to a point variously stated at 10, 20, or 30 feet from the engine, at which point it was the duty of the engineer to release the drum and thereby slacken the rope, and it was the duty of a man who stood upon the rod, just behind the hook, to disengage it from the rod, so that, in passing the engine, the car would not be subject to what would otherwise be a reverse strain from the rope which had pulled it, and would be free to proceed with the momentum acquired to its destination,

at the edge of the wharf. The space between the side of a car thus handled and the engine was so narrow that the man who released the hook from the rod could not remain in the stooping position necessary to be taken for the discharge of that function, and, possibly because there was scant time for him to assume a safe standing position, was expected, immediately upon removing the hook, to step back behind the end, or to climb on top or to jump off the car; the usual thing being for him to get behind the end of the car. When the car reached its destination, its gates, on either side, were opened, and its load was discharged into wooden boxes placed beside the spur for its reception, which boxes were then lowered into the awaiting barge by means of a derrick, stationed between the barge and the engine, for the accommodation of which the engine had been moved from a position which it, at one time, occupied, and from which it had pulled the cars all the way to the edge of the wharf, thereby rendering unnecessary the flying switch arrangement which we have attempted to describe.

The plaintiff, a Swede, 25 years of age, was employed by defendants as a laborer, and had been working for them for 12 days when he received the injury of which he complains. On the morning of May 19, 1905, a car loaded with stone was pulled down the spur to the engine, but for some reason was not given sufficient momentum to carry it to the edge of the wharf, and had to be pulled back and started over again, and it appears that the foreman spoke rather sharply to, or of, the engineer, giving it to be understood that he must do better or quit, so that, when the final attempt was made, at which time the foreman ordered plaintiff to get on the car and let go the hook, it seems probable that more power was applied than usual, and that the engineer was slower in releasing the drum and slacking the rope, the result being

that plaintiff was unable to get the hook off the rod, and whilst endeavoring to do so was carried, with the car, past the engine, whereupon, the power being reversed, the hook was suddenly pulled back towards him, and, tearing off one of the clutches (or cleats) on the rod, caught his foot with it in such a way that it was extricated with some difficulty, and was so mashed that it was necessary, on the same day, to perform an amputation behind the toes, and a month or two later to amputate again about the instep, so that eventually almost half of the foot was lost. There is no doubt, and it was conceded in the argument of the case, that the engineer was in a position to see, and did see, that plaintiff was attempting to disengage the hook, and that he was unable to do so, and that, by applying the power to the other drum, the rope of which was attached to the forward end, he could have stopped the car, and thus have prevented the accident. His only anxiety, however, seems to have been to prevent injury to the engine and to allow the car to reach its destination, both of which objects were accomplished, though the steel rope by which the car was pulled down, being forced against some part of the engine or its apparatus, with the weight of the loaded car, amounting to some 60 tons, plus the momentum, upon the end of it, was broken, or cut, in two. Prior to the occasion thus referred to plaintiff had been mainly employed in unloading the stone from the cars, though he had once or twice performed the function in which he was engaged when injured. He testifies that he had frequently seen that function discharged by others, and that he had frequently heard the foreman warn the men to be careful, but it is not pretended that his attention was particularly called to the possibility of the mishap which befell him, and on cross-examination he gives the following, with other, testimony concerning his knowledge of the subject, to wit:

"Q. It was easy enough to see what has to be done in lifting the hook off, under ordinary circumstances? A. Yes, sir; it was easy enough to see. Q. Did it require any particular skill? A. No; I couldn't see no danger about that—getting the hook off—when I got there. But, then, I didn't know it was so dangerous with this hook we have at the present time when my foot was hurt."

From other testimony given by him it appears that he was under the impression that the hook in use at the time of the accident was not the same one that had previously been used, and that, by reason of the application of unusual power, it had been jammed into the stanchion. The evidence does not, however, sustain that theory, and our conclusion is that, whilst the hook may have been jammed in some way, it was not by being forced into the wood of the stanchion, and that it is not unlikely that the difficulty in disengaging it from the rod arose from the failure of the engineer to release the drum at the usual time and thus relieve the tension of the rope. Willie Simmons, a witness for defendant, who had been performing the same duty, testifies as follows:

"Q. What was there to do except lift the hook and throw it off? A. That's all. If it was hemmed, sometimes you failed to lift it off."

Precisely what he means by "hemmed" is not explained. G. B. Christie, one of the defendants, gives the following testimony concerning the possibility of the hook becoming jammed on the rod, etc.:

"Q. You say there is very little possibility of its being jammed on that rod? A. Not under proper use—no, sir; I should say none. Q. What do you mean by 'improper use,' then? A. I make this distinction; That, when that hook is released there, the rope should not be under tension. You couldn't make a hook that would release under tension."

Plaintiff gives testimony to the effect that he had worked for about 15 months for a

company in the employ of which he had learned something about handling an engine, but his knowledge of the English language is evidently very imperfect, and it is far from appearing that his information was such as to justify the conclusion that he appreciated, or knew, the character of the peril to which he was exposed, when, upon the order of defendant's foreman, he undertook to disengage the hook at the time of the accident. He gives the following testimony as explanatory of his position and impulse at the moment, to wit:

"Q. When you, or the other man who lifted that hook, had lifted it, did you remain standing on the shafting usually, or did you get on top the car, or step around to the rear of the car? A. After you unhook the hook you have to step behind the car—when you get the hook off. Q. You knew that was the habit? A. Yes, sir; I knew that was the habit. Q. Why didn't you step behind the car? A. I was trying to unhook it—because it came to my mind, if I don't it will tear the engine to pieces."

There is some testimony (to which counsel for defendant objected) showing that, after the accident to plaintiff, a rope was attached to the hook by means of which the latter was lifted from the rod by a man who was safely placed on the top of the stone constituting the load of the car. There was judgment in the court a qua in favor of defendant, and plaintiff has appealed.

### Opinion.

Assuming, as the evidence authorizes, that the ordinary speed of the cars whilst being pulled towards the wharf was five miles an hour, and that the tension on the pulling rope was ordinarily released (so that the hook by which the rope was attached to the car could be disengaged) when the car was 20 feet distant from the engine, and we find that the man whose duty it was to disengage the hook was allowed a little less than three seconds within which to arise from the stooping position necessary to do

so, and to get out of the way, in order to escape the danger of being brought into collision with the engine, some part of which, or of the appliances connected therewith, was within 30 inches of the track, and, of course, nearer still to the side of the car to which he must have clung. Upon the occasion of the accident, the car was moving faster than usual, and the distance from the engine, when the drum was released, was in all probability less than usual, so that the time allowed plaintiff to take in the peril of his position, as resulting from the failure of his attempts to disengage the hook, was less than two seconds; and this situation was brought about, on the one hand, by the vicious arrangement which made it not only possible, but probable, and, on the other, by the negligence of the engineer in failing to release the drum while the car was at a greater, rather than a less, distance from the engine. And we do not find that it was a situation the peril of which we can hold that the plaintiff assumed as part of the ordinary, or the obvious, risk of his employment. He was, and is, a common laborer, whose main occupation in defendants' employ had been to unload masses of stone from cars into wooden boxes placed alongside the cars for its reception. On one or two occasions, in obedience to the orders of his superiors, he had undertaken and discharged the function of unhooking the moving cars, but he had never been told that one of the elements of danger incident to that function was that he might be trapped and injured as upon the morning of the accident, and nothing in his testimony leads us to believe that he had ever considered that aspect of the situation. The engineer had made an unsuccessful attempt to send the particular car in question to the edge of the wharf, during which it appears that there was no one on it to disengage the hook. The foreman became impatient and spoke sharply of (if not to) the

engineer, and ordered plaintiff to get on the car and unhook it, and plaintiff had no time to consider then, as he had had no particular reason to consider before, what might happen to him if he should fail in his first or second attempt to disengage the hook and the engineer shoud fail to stop the car. It is quite evident that the precaution of stepping behind the end of the car had no necessary relation to such failures, since it was usual to do that after the hook had been disengaged, and the purpose in doing it must have been to guard against the danger of collision with the engine, which danger plaintiff seems to have escaped by standing erect against the side of the car, his foot being, however, in the meanwhile fastened and mashed between the hook (or the clutch upon which the hook pressed) and the rod, or some other hard surface or angle. The accident was, therefore, in our opinion, attributable to the combined negligence of the defendants in failing to furnish plaintiff with a reasonably safe place and reasonably safe appliances in and with which to do the work assigned to him, and of their employé, the engineer, in failing properly to handle the appliances under his control; and, whatever may be said of plaintiff's assumption of the risk resulting from the negligence of the engineer, there is no support for the proposition that he assumed the risk resulting from the negligence of the defendants as well, or of their negligence combined with that of the engineer employed by them. McGinn v. McCormick, 109 La. 396, 33 South. 382. Plaintiff has been the subject of two amputations—the one, on May 19, and the other on September 21, 1905, and between those dates, and after the last, up to the time that the wound finally healed, he suffered no little. More serious still, he is a young laboring man, whose capacity for earning his livelihood is permanently impaired by the loss of nearly the half, including, as we understand it, the ball, of one of his feet. Whether he will ever again be able to do the work to which he is accustomed is a question of doubt, and it is quite certain that he must, in any event, do such work at a disadvantage as compared with his previous capacity. The theory propounded by the learned counsel for defendants, that plaintiff is in some way responsible for the second amputation, is not sustained by the evidence, which shows that he obeyed the instructions of the surgeons, and did all in his power to bring about a better result. We assess the damage at $2,500, for which amount the defendants, as ordinary partners, are liable jointly.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that there now be judgment in favor of the plaintiff, Alex. Johnson, and against the defendants, George B. Christie, Jesse Lowe, and George A. Ledderly, composing the ordinary partnership of Christie & Lowe, jointly, and against the partnership in the sum of $2,500, with legal interest thereon from the date of this judgment. It is further adjudged and decreed that said defendants be condemned in solido for all the costs of the suit.