of the charge, and the objection to the first part is disposed of by the per curiam of the judge that is not contradicted.

There was an error in the date of the alleged homicide. It is not here urged as an objection. The dates are not controlling in cases in which the defendant is charged with murder. It is certainly highly important, we must say, that the clerical department should verify especially the copies of indictments in the transcripts, and be very sure that all dates therein are correctly given.

For reasons assigned, it is ordered, adjudged, and decreed that the judgment is affirmed.

---

(44 South. 302.)

No. 16,514.

ROFF v. SUMMIT LUMBER CO. et al.

(June 17, 1907.     Rehearing Denied June 28, 1907.)

1. MASTER AND SERVANT—SAFE APPLIANCES.

This is an action by an employé against his employer for damages for personal injuries received by him through the alleged fault and negligence of the latter. The proximate cause of the accident was the employer furnishing his employé with improper and unsafe appliances for the performance of the duty imposed upon him. The employer's duty to furnish safe appliances to his employé is one of the basic obligations of the employer, and it is a continuing duty. It is not sufficient for him to see that they be safe and proper at one time. He must see that they continue so, so long as the work is to be performed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 173.]

2. SAME—NEGLIGENCE.

The employer in this instance was greatly at fault in knowingly allowing a shay engine to be operated as it was, without a screen or guard over the cogs upon it to protect parties from coming in contact with them, and in knowingly allowing the engine to be operated with the tank in the leaky condition it was in. The case is not one calling for the application of the doctrine of contributory negligence. The employé was guilty of no negligence. What he did was precisely what he was expected to do, and the manner in which his work was done was that which the character of the work called for. He performed his work in a careful manner.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 228, 229, 987, 996.]

3. SAME—ASSUMPTION OF RISK.

When a servant enters into the employ of another, he assumes the risks "ordinarily" incident to the business. The willful violation of an employer of his obligation to furnish his employé with appliances which are safe (particularly those with which he will have necessarily to come in contact), and the results to flow from such violation, are not risks ordinarily incident to the business which the employé assumes.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 550.]

4. SAME.

When an employer carries on his business in a manner unnecessarily dangerous to his workmen, it is his duty to take correspondingly proper precautions to protect them against such increased risks. The workman does not waive his right to such protection by entering the service.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 559, 565.]

(Syllabus by the Court.)

Appeal from Fourth Judicial District Court, Parish of Union; Robert Brooks Dawkins, Judge.

Action by Alphin H. Roff against the Summit Lumber Company and others. Judgment for plaintiff, and defendants appeal. Affirmed.

William Hall Trigg and Elder & Moore, for appellants. Preaus & Mathews and Clayton & Hawthorn, for appellee.

NICHOLLS, J. The plaintiff seeks in this action to obtain a judgment in solido against the Summit Lumber Company and the Arkansas Southeastern Railroad Company for the sum of $10,000, with interest thereon. As the basis for this demand, he alleges: That the Summit Lumber Company and the Southeastern Railroad Company had been for several years, and were then, engaged in the manufacture of lumber at a sawmill plant owned by the said defendants jointly and in common at Randolph, Union parish, La., and in connection therewith they together owned and operated a system of railways, tramways, spurs, and switches extending from their said sawmill for several miles into the interior of

Union parish, and covering that territory from which defendants obtained their supplies of logs and timber, which logs and timbers after being cut were hauled and carried by means of defendants' locomotive engines and log trains over their said lines of railway and tramway to their sawmill at Randolph, La.

That the two defendants above named, though nominally distinct concerns, were in fact under the same management, had the same stockholders, officers, agents, and employés, and to all intents and purposes constituted one and the same corporation. That on the 8th day of October, 1905, petitioner was employed by the defendants aforesaid as night watchman and hostler, and as such it was part of his duty to board the incoming locomotive engines of the defendants, to assist the engineers in placing said engines on their appropriate side tracks, to open and close the different switches for that purpose, to take charge of said engines when so placed on the side tracks, to clean up same and give them necessary attention during the night, and generally to perform the duties of night watchman hostler and general utility man for said defendants:

That while employed by defendants as night watchman and hostler, as aforesaid, and on the day above mentioned, it became his duty in the course of his said employment to assist the regular engineer in placing the locomotive engine of defendants on their side tracks at or near Bardulph, Union parish, La., and, while said locomotive was moving at the rate of about four miles an hour, it became necessary in the discharge of petitioner's duty as aforesaid for him to alight from the said locomotive engine, and throw the switch, for the purpose of running said engine into the siding to which it was destined.

That, by reason of the old, defective, leaky, and unfit condition of the tank on the said locomotive engine of defendants, water and steam had escaped therefrom upon the steps of said locomotive and had rendered it extremely slippery and difficult to descend, which condition was at that time unknown to petitioner, and petitioner, while attempting to alight from said engine, and while carefully descending said steps, slipped, and in the effort to recover his balance his heel was caught in the cogs of the said locomotive engine, resulting in a violent, severe, and painful mangling and tearing of petitioner's heel, which injuries have left petitioner a permanent cripple and sufferer for life.

That the cogs in which petitioner's heel was caught and mangled was improperly constructed, and was uncovered, exposed, and dangerous, and was not screened by any fender or other covering such as was usual and necessary on locomotive engines of that kind, and which, if present, would have prevented the injury which befell petitioner.

That petitioner in alighting from said engine did so in a careful manner in the customary way, and as his duties required, and he would have alighted therefrom in safety but for the defective, leaky, and unfit condition of the engine tank aforesaid, the consequent slippery and dangerous condition of the steps of said locomotive, and the unscreened and dangerously exposed condition of the cogs in which petitioner's heel was caught.

That the injuries suffered as above described were due to no fault or neglect on the part of petitioner, but were caused wholly by the gross and wanton negligence, carelessness, and recklessness of defendants in failing to keep their said locomotive engine in proper repair, and in creating and permitting the improper and dangerous condition of the aforesaid tank, steps, and cogs on said locomotive.

That within a few days after petitioner sustained the injuries aforesaid the defend-

ants caused the tank on their said locomotive engine to be repaired, and placed a strong and solid covering over the cogs in which petitioner's heel was caught, securely screening them from all possible contact, and rendering impossible such injuries as that described, all of which precautions could and should have been taken long before the injury to petitioner, and the neglect of which by defendants was gross negligence. That, as a result of the injuries sustained by him, petitioner was confined to his bed for four or five months, unable to get up or to walk. That during this time he suffered extreme pain and physical agony, intensified by a process of skin grafting made necessary by the torn and injured condition of his heel. That petitioner is informed and believes, and, so believing, avers, that he will never recover the use of the injured member, and that he will never be entirely free from pain as a result of his injuries, and that the consciousness of his condition has caused, and still causes, petitioner great mental pain, anguish, and distress.

That at the time of the aforesaid accident petitioner was earning $54 a month, straight time. That, as a result of the injuries received, he was and is incapacitated for work, and is unable to perform any kind of physical labor, which is his only means of support and by which means he formerly earned a livelihood, and that petitioner is informed and believes, and, so believing, avers, that he will never again be able to perform such labor and earn his livelihood as before.

That, by reason of petitioner's injuries aforesaid and the resulting physical pain, discomfort, inconvenience, mental anguish, and suffering, he has been damaged in the sum of $5,000 and in expense for medical attendance, loss of time and wages, and in the permanent disability to perform physical labor he has been damaged in the further sum of $5,000, making a total of $10,000 as above alleged. Petitioner avers that the aforesaid indebtedness is due and has been demanded without avail.

In view of the premises, he prays for service hereof, and citation according to law on the said Summit Lumber Company and on the said Arkansas Southern Railway, and on each of them, and that after due proceedings had there be judgment in favor of petitioner and against the said Summit Lumber Company and against the said Arkansas Southern Railroad Company, in solido, for and in the full sum of $10,000 with ――― per cent. per annum interest thereon from judicial demand until paid, and for all costs of this suit. And further for full, general, and equitable relief.

The defendants answered, pleading the general issue. Further answering, they averred that whatever injury plaintiff received it was by his own fault and negligence, and defendants were in no way responsible for the same.

The district court rendered judgment in favor of plaintiff against the Summit Lumber Company for $3,500, with legal interest from the 21st of August, 1906, until paid.

That company appealed. Appellee has answered the appeal, praying that the judgment be amended increasing the amount awarded to him to $7,500.

Plaintiff urges:

(1) It is the duty of the master to an employé to make use of reasonably safe appliances. Uncovered cogs of a "shay" engine, combined with a leaky tank, which renders the steps used in ascending and descending from the cab of the engine slippery, are not safe, and the master who permits them to be thus—becoming dangerous—is guilty of gross negligence. Stucke v. Railroad Co., 50 La. Ann. 172, 23 South. 342; Gualden v. Railroad Co., 106 La. 409, 30 South. 889; Ingham v. Honor, 113 La. 1040, 37 South. 963; Williams v. Lumber Co., 114 La. 805,

38 South. 567; Moses v. Lumber Co., 114 La. 933, 38 South. 684; Johnson v. Christie & Long, 117 La. 911, 42 South. 421.

(2) Assumption of risk, like the plea of contributory negligence, must be specially urged, and cannot be availed of under the general issue. Especially is this true with reference to the extraordinary risks which are shown to have been created by the master in this case, and which by his employment plaintiff did not assume. Buechner v. N. O., 112 La. 599, 36 South. 603, 66 L. R. A. 334, 104 Am. St. Rep. 455; Labatt on Mast. & Servant, § 841b.

(3) A servant who performs a duty just as he had seen others perform it, and in which men experienced in that kind of work declare is the ordinary and proper method of doing so, is not guilty of contributory negligence. Potts v. Railroad Co., 110 La. 1, 34 South. 103, 98 Am. St. Rep. 452.

Defendant urges:

That the injury which plaintiff received was one which was ordinarily and naturally incident to his employment, and was assumed by him. Carey v. Sellers Co., 41 La. Ann. 500, 6 South. 813; Pollich v. Sellers, 42 La. Ann. 623, 7 South. 786; Sauer v. Oil Camp, 43 La. Ann. 699, 9 South. 566; Dandie v. Railroad Co., 42 La. Ann. 689, 7 South. 792; Henry v. Brackenridge Co., 48 La. Ann. 950, 20 South. 221; McCarthy v. Whitney Iron Works, 48 La. Ann. 978, 20 South. 111; Jenkins v. Maginnis Cotton Mills, 51 La. Ann. 1017, 25 South. 643; Duncan v. Railroad Co., 51 La. Ann. 1785, 26 South. 478; Creole Lbr. Co. v. Mills (Ala.) 42 South. 1023.

(2) All extraordinary risks are assumed by the servant when he has knowledge thereof, or when by the exercise of ordinary care he might have such knowledge. Satterly v. Morgan, 35 La. Ann. 1166; Tillotson v. Texas & P. R. R., 44 La. Ann. 95, 10 South. 400.

(3) The servant's knowledge of patent defects carries with it knowledge of the con-

119 LA.—19

comitant dangers. Erslew v. Traction & R. R. Co., 49 La. Ann. 96, 21 South. 153.

(4) Plaintiff having knowledge of the risk, his comprehension thereof is an unavoidable inference. Welton v. Genessee Lbr. Co., 114 La. 842, 38 South. 580.

(5) A servant is as a matter of law guilty of contributory negligence when, having the choice of two or more ways of performing a given duty and having notice of all conditions, he voluntarily chooses a dangerous method of doing the work when he might have chosen a safe one. Ryan v. Railroad Co., 44 La. Ann. 806, 11 South. 30; Daly v. Mfg. Co., 48 La. Ann. 214, 19 South. 116; Settoon v. Railroad Co., 48 La. Ann. 807, 19 South. 759; Davernet v. Railroad Co., 49 La. Ann. 484, 21 South. 644.

(6) To hold the master guilty of negligence with regard to uncovered machinery the servant must be shown to be excusably negligent or incompetent to appreciate the danger.

(7) No legal requirement imposes upon the master the duty of warning an employé of dangers readily ascertained and where the latter has all means necessary to ascertain the actual condition.

Counsel support their proposition in their brief by copious extracts from decisions of different courts.

We have to examine the facts of this particular case to ascertain whether they bring it within any one or more of the doctrines contended for.

The evidence shows that the plaintiff had been in the employ of the Summit Company as a night watchman for two or three months prior to the day of his receiving the injury which gave rise to this suit. The company used a number of engines in its business. Among these was one which is referred to as a "shay engine," which is geared by a system of cogs for strength, rather than speed. These cogs are not on the ordinary

locomotive. They are only located on one side of the engine, and below and about 24 inches from the side of the steps leading down on the right-hand side of the engine. Plaintiff's duties were to cool the engines as they came in, raise steam, do the switching, and go to and from the locomotive to deliver men and bring them back to camp. His account of the accident is: That on the 8th of October, 1905, he was trying to get some engines from the main line into the siding. It was then dark. He had to use a lantern, as he could not see signals without it. He boarded this particular engine, then at a stand on the main line, on the left side. He was going to throw a switch for the engine to pass into a side track. To do this, the engine had to move forward 40 or 50 yards, pass the switch, then stop and back down to and pass through the switch. He had gone into the cab of the engine to receive orders from the engineer. When the engine started, he made ready to get down. When the car moved, it moved about as fast as a man could walk. He started to descend on the right-hand side of the engine. The way to get down was backward. There was a handhold on the tender and one on the tank. In going down he had hold of each of these, with his lantern swinging on his arm. As he stepped down, his foot slipped on the step. This shook him, and he grabbed hold on the handhold on the tank with both of his hands. This swung him against the side of the tank. As he swung, he reached up and caught the top of the tank in order to prevent himself from falling back into the machinery. This caused the cog gearing and the driver on the tank to catch his foot and to grind it through. There was no guard or shield on the cog gearing where his foot was caught. The tank on the engine was a leaking tank. It was an old tank. When his foot slipped, the steps appeared to be wet and slimy. He had noticed that they were wet always when there was mud upon them. He had noticed before that night that the tank was in a leaking condition. He could not tell at the time of the injury whether the steps were wet and slimy—not by lamplight—for they had no time to see anything. He had noticed before that night that it leaked. It had got so leaky that it would not hold water over the tank at night. He did not know at the time of the accident that the step was slimy and slippery, because he could not see. The step became slippery by persons climbing on and off the ground and mud accumulating on it. The leak was at the bottom of the tank. Water from it ran off on the right-hand side all the time. He never received any instructions as to which side of the engine he should get off. No warning had been given him of any danger connected with the slippery step, or with reference to those exposed cogs. He had considerable experience on the main line around engines, but not much on the tram. A shay engine is more dangerous than an ordinary engine to get on. The cogs (since the accident) have a guard or shield covering them, and the tank has since been repaired and did not leak. He did not clean up this particular shay engine every night. He cooled it down. He carried men on it to and from the camp. He gave an account of the injury he received, which was exceedingly severe, and may result in the amputation of his foot after great suffering. The fact of the injury and its extent is not disputed.

A man by the name of Morris was the engineer on the shay engine on the night in question. He did not see Roff as he went down the step, but did just before. He was holding on to both handholds with his hands. He had his lantern on his arm. It was customary for a man acting in the capacity Roff was acting to do and act as he did. It is customary for the switchman, in order to throw a switch, to get down from the engine

on the side next the switch. Roff in the discharge of his duties was very careful. At the time of the accident the tank was in a leaking condition. It leaked from the bottom. It had three leaks in the bottom. On one side of the tank there was a crack about a foot long. On the other side loose rivets were the cause of the leaking. It had been leaking about a couple of months, but it had not been leaking that bad all the time. It had been gradually getting worse. It was still leaking some, though a patch had been put on it. It dripped down in a good many places underneath the tank, but it would not always fall in the same place; that would depend on the position of the tank sometimes on an unlevel track it would drip in one place and sometimes another—come down between the tank and the tender on the floor. It would come down between the space. At the time of the accident it leaked on the step of the cab. There was no guard or protection at that time to screen the gearing cogs when Roff was injured. There was such at the time witness was testifying. It had been put on since the accident. There is such a guard or screen over the cogs when a shay engine comes from the factory on all he had seen. He had noticed the leaking of the tank before the accident occurred something like two months; at times a person would notice that, at other times not. The steps were not slippery all the time. If a person were walking upon the engine and off of it at different times every day, a person could notice the steps were slippery. If he could have seen it—it is not hid at all—there was nothing to make the steps slippery besides water more than dirt accumulating and sweeping off a person's foot. It was generally the duty of the fireman to clean up the engine at night. Roff did not clean up the engine at night at that time. The nightwatchman becomes responsible for the engine after the engineer leaves. The machinery or cog gearing of the engine is about 24 inches from the step. Powell was the fireman on the engine on the night of the accident. He was not on the engine at the moment. He had filled at one time the same position that Roff did. It was customary to get off a train as it was moving up in order to throw the switch. That was the proper and customary way. He had noticed Roff's performance of his duties. He was awfully careful all the time. He thought it was proper for a person performing the duty Roff was performing to get off the cab on the side towards the switch. It is more dangerous to get up and off and on a shay engine on the side next the cogs than on the other side. There would be a greater danger at night than in the day, as it was dark. A person getting off in the nighttime ought to be more particular than in the daytime. There would not be any particular danger in getting off the right-hand side of a shay engine if there is a guard over the cogs. It would then be as safe as the other. The cogs were at the time witness was testifying protected by a guard. The want of the screen on the cogs would be noticeable to any person around the engine.

The defendant company was beyond a doubt greatly at fault in allowing the shay engine to be operated as it was without a screen or guard over the cogs upon it to protect parties coming in contact with it and in allowing the engine to be operated with a tank in the leaking condition it was. Those engines come from the factory with a guard over it, and the defendants, for some reason not explained, had permitted it to be taken off. It must be held to have had knowledge of those facts as the condition of the cogs and of the tank had continued for several months. We do not find that the plaintiff was guilty of negligence in the performance of his work. What he did was precisely that which he was expected to do, and the manner in which his work was done precisely that

which the character of the act which he had to do called for. He performed his duty in a careful manner. The steps on the right-hand side of the engine were placed there to be used, and obviously a switchman getting off an engine to throw a switch would get off on the side next the switch to be opened. It was not expected that he should wait until the engine should come to a dead stop, and then either go in front of the engine or behind it from the other side.

This is not a case calling for an application of the doctrine of contributory negligence. It involves no such question. The proximate cause of the injury was the slippery condition of the steps occasioned by the employer furnishing his employé improper appliances for the performance of the duty imposed upon him in violation of one of the basic obligations placed by law on the master as resulting from his relations with his employés. The steps were instrumentalities furnished by the defendant company to its employé to enable him to perform his work. Defendant's duty to furnish proper appliances was a continuing one. It was its duty, not only to have the appliances furnished its workmen suitable at one time for the safe performance of the work, but to see to it. that they continued to be so, so long as the work was to be performed. Defendant's fault in respect to the leaking tank in this particular instance was aggravated by the fact that, in spite of the increased danger to the workmen resulting from the situation it allowed the cogs to be uncovered and unguarded, carrying with it as a result of any accident that might happen the most deplorable consequences. Defendant urges that plaintiff assumed the risk of meeting with the accident he did in accepting service with it; that the leaking of the tank upon the steps was visible and known to him and he ought to have refused to do the work if he considered it too dangerous.

Its proposition is that, though it had itself willfully violated one of the most important obligations of its contract by furnishing the plaintiff with improper appliances for his work (forcing him to perform it under unnecessarily dangerous conditions), it was not the company which assumed the risk of any resulting accident under such conditions, but was the workman (working under the necessity of gaining his living) who assumed the risk of an accident happening to himself under such circumstances.

The statement of that proposition it would seem should carry with it its own refutation. If that were true, the jurisprudence under which an employer is prohibited from entering into an express agreement with an employé—that he will waive all damages against the employer for his negligence—becomes nugatory. It would suffice to bring about the same result under such a construction of the law that contract of labor be held to have been entered into with the implied obligation by the employé that he would not claim damages from a willful violation by the employer of his obligations, if that violation should be known. There would be no check upon the violation of their contracts by employers if that construction of the law were adopted.

"Servants," said Lord Cranworth, "must be supposed to run the risk of the service in their contemplation when they voluntarily undertake it and agree to accept the stipulated remuneration. This, however," he adds, "supposes that the master has secured proper servants and proper machinery for the conduct of the work." Wood on Master & Servant (2d Ed.) p. 675.

The rule on that subject as found in the best writers usually reads that when a servant enters into the employ of another he assumes all the risks "ordinarily" incident to the business. He is presumed to have contracted with reference to all the hazards and risks "ordinarily" incident to the employment.

The willful violation of the defendant of his legal obligation to furnish its employé

with appliances with which he would necessarily have to be thrown into direct contact, and the results of that violation were not risks ordinarily incident to the employé's work which he assumed. In this case the engine from which the employé was getting down was one of a number in the service of the defendant.

Plaintiff was called on to perform his work at night. Whether Roff slipping on the step was due solely to the presence of water upon it, or to the presence of mud, as well as water, does not appear. Plaintiff was not required under the circumstances of the case to show precisely what the cause of his slipping was. Kennon v. Railroad Co., 51 La. Ann. 1599, 26 South. 466. He testifies that he did not see anything on the steps on that night and obviously he did not know of anything being upon it.

We are of the opinion that the defendant in its action and conduct was greatly at fault, and that the plaintiff was not at all so. We are of the opinion that the judgment appealed from is correct, and it is hereby affirmed.

MONROE, J., concurs in the decree.