On Rehearing.
MONROE, J.
[1] As stated in the opinion heretofore handed down, the derrick was a towerlike structure, some 85 feet high, which tapered from bottom to top, and which, at the lower floor, where the accident occurred, and which was about 3 feet above the ground, was 22 feet square. It was built of pieces of timber, placed upright, and held together by girders, at intervals of 8 feet, and braces, which ran diagonally from one set of girders to another. Through the center of the structure, and the floor, ran the drill (or “rotary”), consisting of iron piping, with a bit upon the lower end, and, to the upper end of which, as the lower end penetrated more and more deeply into the ground, additional joints of pipe were attached. The power by which the drill was rotated was communicated by means of a chain, geared upon sprocket wheels, from an engine, standing upon the ground upon the outside, to a shaft, which ran across the derrick, on the side nearer to the engine and underneath the first girders above the floor; thence, by another chain, similarly geared, from the shaft to a drum, which rested on the floor, beneath the shaft; and thence, as we understand the matter, by means of another chain, or a wire rope, to the drill, or rotary. The driller stood upon the floor, with his hand upon the lever whereby he started and stopped the machinery, and in such a position that he could watch the progress of the drill, to his right, and also keep an eye upon the drum, nearly in front of him, or somewhat to his left. He had entire control of the machinery and of the men who were employed about the derrick, and it was necessary for him, at intervals, and by means of the machinery, to pull the drill out of the ground, in order to renew the bits, upon which occasions it was the duty of the decedent, who was the “derrick-man,” to climb to his station, on a floor 50 feet above, by means of a ladder (consisting of crosspieces nailed to the outside of the derrick) and “take the lever bar off * * * and put it on again.” Just before the accident, the decedent had been to his dinner, and Stephens (the driller) describes what then occurred as follows:
“I was standing drilling, and he came up on the derrick floor and came around between where I was standing and the rotary, in front of the drum and this chain; and he says, ‘Are you going to pull out?’ And I says, ‘Yes.’ He looked at the rotary for a minute, and says, *973 ‘When are you going to pull out?’ and I says, ‘Right away.’ And he turns to look'at it again, and, just as he turned, he took a cigar out of his mouth — he was smoking — and he says, ‘It’s going good,’ and turned to look at it again, and, as he turned, facing the rotary, the chain broke, came over the girt and struck him in the head.”
We think that we can hardly do better than to quote somewhat further from the testimony of the same witness, as showing the decedent’s reasons for coming up on the derrick floor at that time and as establishing, or tending to establish, a basis for a comparison of the negligence with which defendant charges him with that of which defendant, itself, was guilty.
The testimony runs as follows:
“A. He wanted to know if we were going to pull the pipe out of the hole, in order to put on a new bit. Q. Was that about the time to do that? A. Yes, sir; been doing it about that time for a day or two. We didn’t have any certain time to pull it up. Q. Had he made any preparations for going up on the derrick? A. Yes, sir; he had just gotten through dinner and had tied a handkerchief over his head to protect his head. Q. Where was he to go when you would go to pull it? A. He would go up on the derrick, about 50 feet up. * * * Q. He came there and asked you if you were going to pull out, and prepared to go up there and do his part? A. Yes, sir; he was a man that was always ready to do his part. Q. State whether he had been there long? A. He had been there about a minute and a half, or two minutes. Q. Just long enough to say what you have said? A. Yes, sir; just long enough to say what he said. * * * Q. Now, what did he come to you for? A. Well, that is all the business that I know of; he asked me if I was going to pull out, and when. Q. He came to you on business, did he not? A. I don’t know whether it was on business or not. Q. You don’t know whether that meant business or not. A. Information, I suppose he wanted. Q. Information about his work, was it not? A. Well, I suppose, of, course, that applies to his work; that was not his particular business. Q. Whose business was it? A. Mine; I would have him come to me. Q. You would have him come to you? A. Yes sir; if in sight. Q. Would he stand and watch you and wait until you would motion him to come to you? A. No, sir; he didn’t make it a point to watch me, but they were generally standing about, so that I could call their attention. Q. Then what would they do, after you had called their attention? A. Owing to what I wanted them to do. Q. Would they come to you? A. Yes, sir. Q. You would not stop and go to tell them what you wanted done? A. No, sir. Q. You would have them come to you? A. Yes, sir. Q. Is there any noise around the drilling? A. Yes, sir; most ■everything about it is noise. Q. And that was a windy and noisy day? A. Yes, sir. Q. Mr. Stephens, was there anything unusual in his coming to you to get orders? A. No, sir; it was the usual thing. He come around and talked. * * * Q. Mr. Stephens, would you expect Mr. Underwood to get up there on the ladder without knowing whether you were ready to draw out or not? A. No, sir. * * * Q. Then there was nothing strange in his asking you the question? A. No, sir.”
As bearing upon the danger to be incurred in going up on the derrick floor, at all, and in going upon the particular part of the floor where the decedent was injured, we quote the following from the testimony of the same witness, to wit:
■ “Q. Now, as a matter of fact, is not the driller the only man in the crew, or is he not, of all men in the crew, exposed to more danger by the breaking of the chain? A. Yes, sir; of those two chains. * * * Q. Was there any particular position that people would take when they would come there to ask you for orders? A. No, sir. * * * Q. They would come to you frequently for orders? A. Yes, sir. Q. Just as he did that day? A. Yes, sir; while not as he did that time; they didn’t, invariably, go around to that particular place. * * * (Cross-examination.) Q. Is that a dangerous position? A. Yes, sir. Q. What is the most dangerous position on the floor of the derrick? A. Well, I don’t know. Q. Well, is it not more dangerous to stand in line with the chains than to stand out of line with them? A. Yes, sir; some.”
J. G. McCure, superintendent of the Producers’ Oil Company, examined on behalf of defendant, testified that he had been in the oil business for 20-odd years, and, further, in part, as follows:
“Q. Well, what would you say as to the safety of that locality on the derrick floor, immediately in line with the engine chain and between the rotary and the drum? A. It is very unsafe, at any time, in that immediate place. * * * Q. Can you say whether or not any man of experience knows the danger of the space on the derrick floor between the r.otary and the drum and in line with the engine chain? A. Yes, sir; I should think that he would, because that is a very dangerous spot, and they all should know it, if they don’t. Q. Would a man assume that position, if exercising caution? A. Well, I am inclined to think not; I would not I know.”
*975 W. O. Wolf, also a witness for defendant, and a builder of derricks, who had been around oil drilling rigs for eight years, testified in part as follows:
“Q. Mr. Wolf, what have you to say as to the danger of standing in front of the drum on the derrick floor in front of the engine chain; is that a dangerous place? A. Yes, sir. Q. Would you say that a man who had experience in the drilling business would know that it is a dangerous place? A. It looks as if he would. Q. What is the danger of that place? A. The chains very often break. Q. That is a common occurrence? A. Yes, sir. (Cross-Ex.) Q. Mr. Wolf, you say that there is no particular business for a man at the point inquired about unless he is called there for some purpose; if the driller had called him there, and he would come around, I suppose he would come there too? A. That would be left to him as to where he would stand. Q. There would be nothing remarkable about the place he stood, if he went to get orders; there is no place marked out where he should stand? A. No, sir. Q. He goes to where it is convenient for him to speak to the driller and for the driller to speak to him? A. Yes, sir; I should think he would'. Q. I suppose people walk about on the platform — on all parts of it? A. Yes, sir. Q. Indiscriminately; there is no dead line in front of this place? A. No, sir; there are some places that are more dangerous than others.”
Herbert Lancaster, also a witness for defendant, testifies as follows:
“Q. What have you to say as to the danger of standing on the derrick floor, in front of the drum of the engine chain, while the well is being drilled; is that a dangerous place? A. To a certain extent, it is, yes; you could not tell; it is very uncertain. * * * Q. Is it a fact, or not, that a man of experience in the drilling business knows that it is a dangerous place? A. I believe that they do. * * * Q. Well, after this accident happened, didn’t you see some of the boys do something to prevent such an accident in the future? A. Yes, sir; shortly afterwards. Q. What did you do? A. We put up a piece of 2 by 10, upright, so as to prevent the chain from going over the girder. Q. Just put up a piece of plank, 2 by 10? A. Yes, sir. Q. Two inches thick and ten inches wide? A. Yes, sir. Q. Now, if that piece had been there before, do you think it would have prevented this accident? A. Yes, sir. Q. About how much was the expense of putting it up? A. Very little, I suppose. Q. About how much plank did you use? A. A piece about six or eight feet long. * * * Q. If that was such a dangerous place, why did they not put it up there before? A. I hardly paid much attention to it. Q. They must not have regarded it as so very dangerous before any one was killed? A. Well, it was regarded as a dangerous place; but I never did think much about it while I was working around. Besides, we have something else to think about. Q. When a man is working, he thinks more about his work than his danger? A. Yes, sir. Q. That becomes a habit with people who work about dangerous machines? A. Yes, sir.”
Stephens, the driller, interrogated concerning the plank to which the witness Lancaster refers, testifies as follows:
“Q. Mr. Stephens, after this accident, did you put up any guard? A. I did not. Q. Has one been put up? A. Yes, sir; one has been put upon the rig. But I don’t remember which one did it. * * * Q. You personally did not put it up? A. No, sir; nor I did not tell him to put it up. * * * Q. Well, if it had been there at the time that this chain broke, would it have cheeked the chain and prevented the accident? A. I suppose that it would, though I don’t know. * * * Q. You suppose that it would have prevented the accident? A. Yes, sir.”
It appears from the testimony of Mr. Stephens that the chain in question was a secondhand chain (which had been brought with the rig, from another field) when he began to use it, and though he says that he looked over it every day, as it was moving, slowly — being oiled — the character of his inspection (if he meant inspection) is not, at all, dwelt upon.
On the other hand, he and other of defendant’s witnesses admit that the link which broke, and which has been brought here as an exhibit, is very badly worn and was dangerous, and there is no testimony whatever to rebut, what appears to us to be, the reasonable presumption that such wearing required considerable time and use. Mr. McCure (whom we have already quoted), referring to the manner in which such chains are used, testifies as follows:
“Q. Is it reasonably safe to begin the drilling of a well with a chain that has been used before? A. Yes, sir; we usually do use chains that have been used. We just run with them until they break. * * * Q. How many chains do ypu usually have in drilling a well? A. Well, now, I don’t know; we generally put a chain on and let it run. Q. Until you consider it is too much worn? A. Yes, sir; until it gets so it will not run any more. I think that *977 is the rule. Q. What is the usual method of inspecting a chain? A. Really, I don’t know that there is any particular method. If the chain don’t stand, we put in a new one. Q. Don’t they inspect it from the sound, as it runs over the sprocket wheels? A. I don’t know that that is so, not that I know of.”
The same witness also says:
“A. Yes, sir; there is considerable danger with any part of the work. * * * Q. Mr. McCure, I suppose that there is no absolutely safe place on the derrick? A. No, sir; I don’t think there is.”
Mr. Stephens, on that subject, gives the following testimony:
“Q. Mr. Stephens, sometimes these chains break in two places at once? A. I have never seen that one break in two places, but I have seen the 103 malleable break in two places. Q. In that case, where would the pieces go? A. Sometimes they would go. one way and sometimes they would go another. Q. They go with a great deal of force? A. Yes, sir Q. They are iikely to go through the derrick like they were shot through? A. Yes, sir.”
The derrick floor was, then, a dangerous place, to the knowledge of everybody, and, to the knowledge of everybody, the danger, or one of the dangers, lay in the probability that the chains, one or both of them, would break. It will be noticed that the driller, in answer to the question, “Now, as a matter of fact, is not the driller the only man in the crew, or is he not, of all men in the crew, exposed to more danger by the breaking of the chain,” replied: “Yes, sir; of'those two chains.” From which it must be inferred that his position exposed him to danger from the chain which conveyed the power from the engine to the shaft as well as that which conveyed the power from the shaft to the drum; and it is evident that, when a chain broke in two pieces, he was so exposed no matter where he may have placed himself. Taking the testimony of the driller and of Mr. McCure together, it does not appear to us that the chains were inspected at all. It is true that the driller said that he looked over them every day; that is to say, he looked at them every day whilst they were in motion and being oiled. But, if he had really inspected them, he could hardly have failed to discover the worn and weakened condition of the link, the breaking of which caused the death of the decedent; for, though defendant’s counsel say that such a condition may be brought about suddenly, none of the witnesses so testify, and we think it much more likely that the wearing was gradual. It is also true that the testimony shows that new chains sometimes break, from which it may be necessary to concede that, under the conditions as they existed, those who worked upon the derrick floor, including Stephens, could not have been entirely protected from breaking chains even by an efficient inspection of the chains, though, so far as we can judge, such inspection would have saved Underwood’s life. But the more we concede with regard to the danger from the breaking of - chains and to the difficulty of providing against it, by their proper inspection, the more culpable does the failure of the defendant to adopt other measures of precaution appear. Lancaster, to whom Stephens refers as “one of the boys,” had no difficulty, after Underwood was killed, in seeing that the killing of another man, in that way and place, could be prevented by the putting up of a single plank, and it seems to us apparent, from an inspection of the model that has been brought up, that by the use of a few more planks the whole derrick floor could have been made safé from that particular peril, and that defendant could have seen it as readily before Underwood’s death as Lancaster did afterwards. Stephens, who, as to Underwood, represented defendant, testifies, not only that he did not put up the plank, even after the accident, but that he did not tell any one to put it up; from which we conclude that his habit of mind was about that described by Lancaster. That is to say, he gave more thought to his work than to his *979 danger or to the danger of those who were working under him.
Whilst, however, Lancaster’s statement that it becomes a habit with people who work around dangerous machines to think more about the work than the danger, maybe regarded as a commonplace truth, the fact that it is so makes it all the more imperative that those who employ people to work around dangerous machines should think, at least, as much of the danger as of the work, since the -burden rests upon the employer to furnish the employé with a reasonably safe place in which to do his work, and the employé, relying upon the employer to discharge that obligation, may, to some extent, be excused for not assuming it.
[2] Applying those conclusions to the facts of the instant case, we are of the opinion that it was negligence, so gross as to border upon criminality, for defendant to have provided a place, such as the derrick floor, where its employes were expected to go, and were in the habit of going, in the proper discharge of their duties, and where they were subjected to the danger of being killed at any time, by a broken chain, when that danger might have been guarded against by an expedient, so simple, so patent, and so inexpensive, as that which, after the death of- Underwood, was adopted, of his own motion, by another of its employés. Nor do we, after carefully considering the matter, find anything in the conduct of Underwood which should shield defendant from the consequences of that negligence. It is true that the witnesses who were asked whether the particular place where Underwood was standing, when he was struck by the chain, was a dangerous one, answered in the affirmative. On the other hand, Stephens testified that he was exposed to more danger, from the breaking of a chain, than any other member of the crew; that he did not know which was the most dangerous place on the floor of the derrick; that the men had no particular place to stand when they came to him for orders, though they did not “invariably” go around to the place where Underwood went; and, being asked, “Well, is it not more dangerous to stand in line with the chains than to stand out of line with them,” he answered: “Tes, sir; some.” He also testified that the chains sometimes broke in two pieces, which flew in any direction, as though they had been shot; and it does not appear that it occurred to him that Underwood was in any particular danger, during the minute and a half or two minutes that they talked, as we find no suggestion that he then mentioned it, as he, no doubt, would have done if he had considered the matter at all urgent. Wolf, too, says that there was no “dead line” on the floor, and that persons, desiring to speak to the driller, would go to the place most convenient for that purpose. And Lancaster, being asked the usual question: “What have you to say as to the standing in front of the drum and of the engine chain, while the well is being drilled; is that a dangerous place?” answered: “To a certain extent, it Is, yes; you could not tell; it is very uncertain.” From all of which we conclude that, whilst the place referred to was regarded as dangerous, so much so that no one wishing to remain on the floor for any length of time would deliberately place himself there, the danger was not an obvious one and was not regarded as imminent, and there was no such choice between it and any other place, where the driller could be talked to, as to have prevented one of the employés from going there, for a moment, for that purpose. But let us suppose that it was otherwise, and that the spot upon which Underwood stood when he was struck was regarded as too dangerous for -any one to occupy, even for a moment, and that Underwood knew it; how does his inadvertence (as, under such *981 circumstances, we think it might he considered) in so doing compare with the conduct of the defendant in having such a place on the floor, where its employes were coming and going, and, having it there, in failing to enclose it or to erect some sign to remind those who might come in the neighborhood of the danger; and what are we to think of Stephens, who allowed Underwood to stand where he did, and talked to him, without suggesting that he might find a safer place to stand?
On the one hand, the defendant was guilty, as it appears to us, of inexcusable and continued negligence, in failing to take the slightest precaution for the protection of the lives of those to whom it owed the duty of taking all the precaution that the circumstances could reasonably call for or permit. On the other hand, defendant’s employs failed for a minute and a half or two minutes to realize, or to remember, that a particular, open, unmarked, spot or line, on the floor of the derrick, was regarded as more unsafe than other unsafe spots or lines on the same floor — a thing which was not only likely to occur, but which, sooner or later, as we think, was certain to occur, and which, judging from Stephen’s statement, to the effect that the men did not “invariably” go around to , that spot when they came to speak to him, had frequently occurred.
Such inadvertence, or momentary. failure to appreciate a nonapparent danger, can hardly be called negligence, because, being inherent in human nature, the most prudent are not exempt from it, and, in view of the fact that the provision was so obvious and could so easily have been made, it should have been provided against by the employer, who, having without reason or necessity, subjected the employe to the danger, had no right to expect never-failing and superhuman watchfulness, on his part, to escape it. To hold otherwise would be to require too little from the one and too much from the other.
In Kane v. Northern Central R. Co., 128 U. S. 91, 9 Sup. Ct. 16, 32 L. Ed. 339, it appeared that the plaintiff knew that there was a step missing from one of the freight cars, constituting the train upon which he was employed, and that, in attempting to let himself down from the car, he forgot, or failed to recall, that fact, and consequently fell and was injured. The trial court sustained the plea of .contributory negligence and dismissed the suit. The judgment was reversed by the Supreme Court, where it was held that:
“The court erred in not submitting to the jury to determine whether plaintiff, in forgetting, or not recalling, at the precise moment, the foot that the car from which he attempted to let himself down was one from which a step was missing, was in the exercise of the degi’ee of care and caution which was incumbent upon a man of ordinary prudence in the same calling and under the circumstances in which he was placed. If he was, then he was not guilty of contributory negligence that would defeat his right of recovery.”
[3] Upon the subject of the assumption of risk, the most that can be said is that Underwood assumed the risk of the breaking of a chain which had been properly inspected. He did not assume the risk of defendant’s using a chain, and particularly a secondhand chain, without the proper Inspection, constantly repeated. And we believe that the chain by which he was injured was not so inspected, and, if it had been, would have been found unfit for use.
The servant does not assume the risk of the master’s negligence. Roff v. Summit Lumber Co., 119 La. 571, 44 South. 571; Hough v. Railroad Co., 109 U. S. 213, 25 L. Ed. 612; Northern Pacific Railroad Co. v. Peterson, 162 U. S. 346, 16 Sup. Ct. 843; 40 L. Ed. 994; Dresser on Employer’s Liability, pp. 192, 199; Labatt on Master & Servant, *983 vol. 2, pp. 511, 556; Bailey on Master & Servant, p. 461.
“Servants,” said Lord Cranworth, “must be supposed to run the risk of the service in their contemplation when they voluntarily undertake it and agree to accept the stipulated remuneration. This, however,” he adds, “supposes that the master has secured proper servants and proper machinery for the conduct of the work.” Wood on Master & Servant (2d Ed.) p. 675.
[4] The remaining question is as to the quantum of damages, and the elements to be considered in ascertaining and fixing the same. Plaintiffs are the two brothers of the decedent, and they sue in his right and in their own, under Civ. Code, art. 2315, which, as amended by Acts Nos. 71 of 1884, and 120 of 1908, reads:
“Every act whatever of man which causes damage to another, obliges him by whose fault it happened to repair it; the right of this action shall survive, in case of death, in favor of the children or widow of the deceased, or either of them, and, in default of these, in favor of the surviving father and mother, or either of them, and in default of any of these, then, in favor of the surviving brothers and sisters, or either of them, for the space of one year from the death; provided, that, should the deceased leave a widow together with minor children, the right of action shall accrue to both the widow and minor children; provided, further, that the right of action shall accrue to the major children only in those cases where there is no surviving widow or minor child or children. The survivors above mentioned may, also, recover the damages sustained by them by the death of the parent or child or husband or wife or brother or sister, as the case may be.”
The decedent was about 27 years of age at the time of the accident, and left neither wife nor child nor parent, and no brother or sister, other than plaintiffs, one of whom was of the same age (being a twin) and the other a few years younger. Neither of the plaintiffs was dependent on the decedent, nor had they seen much of him for several years pri- or to his death, though their relations were brotherly and affectionate, and the decedent had rendered some assistance to the younger brother in the completion of his education. After the accident, the decedent was removed to a sanitarium, at the instance of defendant, and defendant arranged for the medical attention and nursing which he there received, and, as we take it, is liable for those expenses, as, also, for the expense of the burial.
The physician by whom the decedent was attended was called to the stand as a witness, expert and otherwise, for plaintiffs, and gave the following testimony upon the question whether his patient experienced any-suffering:
“Q. Doctor, what was his injury? A. Fracture of the skull; penetrating the brain. Q. Did it cause paralysis of any part of the body? A. Yes, sir; it caused paralysis of the arm, leg, and, in fact, his entire right side. He was. struck on the left side. Q. In the condition in which Mr. Underwood was, from the time that you first saw him up to the time that he died, was he ever in a condition in which he could have felt any pain? A. Well, I hardly think that he was, because, at the time when he was at his best — when it looked like he was doing his best — he was not suffering, as the wound was drained and was giving him no cause for suffering, and, towards the last; he was paralyzed and did not appreciate anything. Q. Doctor, can there be any pain when a man can-' not feel it? A. No, sir. Q. Doctor, what is pain? A. Pain is simply the operation of the brain, of the crying out of the nerves. Q. So-that, if the brain and the nerves are not in a condition to receive pain, there is no pain? A. No, sir. Q. So that a man unconscious cannot suffer pain? A. No, sir. Q. And he was not in a condition to suffer pain, from the time you saw him? A. No, sir; I don’t think that he was ever entirely conscious. He was, at one time, semiconscious. Q. Then, could he have felt any pain? A. During that time, he was not suffering much pain, because there was not any cause for suffering much pain. * * * (Cross-examination.) Q. Doctor, I believe you said that, part of the time, he was partly conscious; he would answer to his name? A. He never would speak. Q. He would show that he knew when he was spoken about? A. Yes, sir; you could arouse him, and he would look at you, and perhaps smile. Q. And make an effort to speak? A. Yes, sir.”
One of the plaintiffs, who was in constant attention upon the decedent during a greater part of the time, between the date of the accident and that of the death, testifies as follows:
“A. If the signs of a human being betoken his feelings, I am sure that he suffered intensely. *985 * * * Q. Did he undergo any operation during that time? A. Tes, sir; according to the •statement of the doctors and the evidence apparent, he appeared to have undergone two operations. * * * I could see that his scalp was •cut in three different ways. I helped to dress the wounds several times. I could see that it had been worked on; his skull appeared to sink in there.”
To the testimony thus quoted there is add■ed this admission, viz.:
“It is admitted that medical experts would, if «worn, differ in their opinion as to whether an injured person, in a semiconscious condition, experiences pain.”
It will be observed that the physician says that, during the time that the deceased was semiconscious, “he was not suffering much pain,” from which we infer that he entertained no doubt that a person in a semiconscious condition may suffer pain, much or little, according to circumstances. And we can conceive of no reason why, if one be •semi, or half, conscious of .anything, he should not be semi, or half, conscious of pain; in fact, it appears to us that, though -one may be semiconscious of other things, that term can hardly be applied to the physical suffering, resulting, for instance, from acute indigestion or colic, which compels a man to roll and toss about in his sleep and finally awakes him, or to the mental suffering, superinduced by the same physical cause «.nd which may consist of an agony of apprehension lest one fall down an imaginary precipice or be crushed by. an imaginary weight. The learned doctor who testified, no ■doubt, visited his patient at stated times, as the ease seemed to require; but the brother was with him day and night, and it may well he that, in saying, “if the signs of a human being betoken his feelings, I am sure that he suffered intensely,” he was referring to the long reaches of the night and the intervals during the day, when he saw the patient and the doctor did not. We are therefore of opinion that the testimony, taken as a whole, authorizes the conclusion that the decedent suffered considerable physical pain, though we do not find that it shows that he suffered mentally otherwise than as connected with such physical pain; in other words, the testimony does not convey the impression that he, at any time, realized or apprehended that his injury would result fatally. Upon the cause of action which he had, at the moment of his death, therefore, the evidence entitles plaintiffs to recover for only the physical pain to which we have referred.
[5] The remaining question is: What, if anything, are plaintiffs entitled to recover upon the cause of action conferred on them by the last’ paragraph of the statute; that is to say, what damages have they, themselves, sustained by reason of their brother’s death?
Prior to 1855, article 2315 (then 2294) of the Civil Code read:
“Every act whatever of man which cause's damage to another obliges him by whose fault it happened to repair it.”
And it was a literal translation of article 1382 of the Code Napoleon, under which the French courts have always held that the death of a person, through the fault of another, may furnish a cause of action on behalf of certain survivors, and that mental suffering, or “prejudice moral,” and material injury, alike, are elements to be considered.
Thus in Fuzier-Hermann (Code Civil, Annoté, vol. 3) we find:
“557. Le dommage qui engage la responsabilité de son auteur dans les termes des arts. 1382 et s. s’entend du dommage moral, comme du dommage matériel. Casse Beige, 17 mars 1881 (S. 82.4.9, p. 82.2.14)” — citing, also, Larombiere, arts. 1382, 1383, Nos. 36, 37; Laurent, vol. 31, No. 672; Aubry et Rau, vol. 4, p. 748.
“558. Spécialement du dommage moral causé par la mort d’un parent.
“559. En consequence, les parents dont l’enfant est mort, a la suite d’un accident causé par l’imprudence d’un tiers, ont le droit de réelammer a ce tiers des dommages — intéréts * * * occasioné par les frais de maladie, les frais fun *987 éraires, etc., mais encore pour le prejudice moral résultant de l’atteinte portée 3. l’affection des parents par la perte d’un enfant en qui_ ils pouvaient légitimement enlrevoir un soutien pour l’avenir. Bordeaux Nov. 1881 (S. 82.2. 183, p. 82.1. 920).
“560. Décidé encore que les juges saisis d’une demande en dommages — interSts formée par un mari commercant contre 1’auteur d’un accident qui a causé la mort de sa femme, doivent compte du prejudice moral résultant, non pas uniquement de la ¿ouleur du mari, mais encore, et principalement, de ce qu’il lui sera impossible de trouver a l’avenir dans le personnel par lui employe, le coneours d’aptitude, de qualités et de dévouement qui lui apportait sa femme dans son commerce. Bruxelles, 13 janvier, 1890 (S. 90.4.23, p. 90, 2.40).”
So, also, in Dalloz, among the annotations upon C. N. 1382, we find:
“No. 46. Un dommag'e matériel n’est pas le seule qui donne ouvérture a l’action en reparation, il suffit d’un interét moral. ^ ^
“No. 290. Que le prejudice causé soit matériel ou moral la'responsabilité est encourue.”
“Nos. 107 243. Le chiffre des dommages — interets dus a la veuve et aux enfants de la victime d’un accident de chemin de fer, doit Stre basé non seulement sur le dommage — matériel par eux éprouvé, mais encore sur le prejudice moral résultant de la perte du pSre de famille, des affections briseés et de la douleur, sans que néamoinsi la somme soit hors de proportion avec la perte réelle et appreciable a prix d’argent.”
“No. 342. Lorsqu’il y a prejudice moral, les tribunaux doivent l’apprécier suivant les régles de l’équité.”
While our law was in the condition stated, there was presented to this court the case of a widow, suing in her own behalf and in behalf of her minor children, for damages for the negligent killing, in a railroad accident, of the husband and father, and this court, through Rost, X, in rejecting the claim, said:
“On general principles, the only private rights which laws recognize and which Constitutions are established to protect are the rights of persons .and the rights of property. The plaintiff and her children do not complain of any wrongs to their own persons, and it cannot, be pretended that they had any rights of property in their husband or father. It appears to us, therefore, that, without a special statute authorizing such actions, they cannot he maintained. It is a strong argument in favor of this view of the law that, in a country where private rights are so well protected as they are in England, it is settled that those actions do not exist at common law. Baker v. Bolton, 1 Campbell, 493. In Carey v. Berkshire R. Co., 1 Cush. (Mass.) 475, a case similar to the present, the rule of the common law was reaffirmed. * * * In England, of late years, this omission has been supplied by statute in a limited class of cases. 9 & 10 Victoria, c. 93. # * * * * * *
“It is further urged that, under article 2294 (now 2315) of our Code, every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it, that this article has enlarged the remedies given by our former laws in cases of damages arising from tortSj and that the present action should be maintained under it. It cannot be denied that the commentators on the same article in the Napoléon Code seem to favor that opinion, and that the Court of Cessation has adopted it in two instances. Great as is our deference for that enlightened tribunal, we are unable to adopt their conclusions,” etc. (Italics by the present writer.) Hubgh v. N. O. & Car. R. Co., 6 La. Ann. 496, 497, affirmed in Hermann v. Same, 11 La. Ann. 5.
The case thus referred to was decided in 1851, and, four years later, the General Assembly amended and re-enacted the article 2294 so as to provide that the right of action thereby given to a person injured should:
“Survive, in case of death, in favor of the minor children and widow of the deceased, or either of them, and, in default of them, in favor of the surviving father or mother, or either of them, for the space of one year from the death.” Act March 18, 1855, No. 223; Rev. St. 1856, p. 79, § 18.
But no other right of action was given to a person surviving, on account of the death of another, and it was thereafter held that a petition by a father, alleging the death of his child through the negligence of a third person, and alleging his own and the mother’s mental suffering on that account, disclosed no cause of action. Earhart v. N. O. & Car. R. Co., 17 La. Ann. 243.
In another case, where the surviving husband sued on behalf of his minor child, as exercising the right of action inherited from its mother, and also a right of action on its own account, and where the husband likewise claimed damages for himself, it was held that the right of action first mentioned was the only one that the minor had, and that *989 the husband, had. a right of action for the recovery of the “expense and damage” which he suffered, after the infliction of the injury by reason of which his wife died — meaning, thereby, the actual expense to which he was subjected by reason of the accident. McCubbin v. Hastings, 27 La. Ann. 716, 719.
In still another ease, it was held that the right of action accorded by the act of 1855, to the minor child, the widow, and the parents, could not be extended to the husband or any one else.
“Article 2315,” said the court, “appears quite clear on this particular point, and cannot be construed so as to confer the right upon persons not expressly mentioned in it. In the absence of the amendment made to the original article 2294 of the code of 1825, no right of action would exist at all. It took special legislation to bestow it upon certain named beneficiaries, and that legislation cannot be liberally construed.” Walton v. Booth, 34 La. Ann. 914.
In 1884, the General Assembly, by Act No. 71, amended and re-enacted article 2315, as then existing, and added to it the paragraph:
“The survivors above mentioned may also recover the damages sustained by them by the death of the parent, or child, or husband, or wife, as the case may be.”
And, shortly afterwards, there was presented to this court a case predicated upon a cause of action which had arisen prior to the passage of the act of 1884, being a case in which a mother, suing for damages for the negligent killing of her son, claimed a certain amount, in his right, for the physical and mental suffering endured by him, and a further amount for “the loss of his support and the deprivation of his society, care, and attention,” and the court, among other things, said:
“The second item of damage cannot be considered. Legislation and jurisprudence have combined to perpetuate the extraordinary doctrine that the life of a freeman cannot be made the subject of valuation; and, under the dominion of that dogmatic utterance, made earlier than the Roman Digest, reproduced therein, and echoed by the courts of all countries from them till now, the singular spectacle has been witnessed of courts sanctioning damages for short-lived pains and refusing them for a long-life sorrow and pecuniary loss consequent upon the death of one from whom was derived support, comfort, and even the necessary stays of life. Legislation has, at last, come to the relief of future sufferers. The act of 1884 applies the remedy that the public conscience has long demanded, but it has missed application to this case only by a few days. The act was approved July 10th and took effect in Bossier on the 30th. The accident and death occurred on the 25th of that month. * * * Among the numerous instructions excepted to by the defendant is the following: That, while the plaintiff could not recover damages for the death of her son, the jury may assess them in her favor for loss of his society and services and for support to such an extent as it appears that he would have given her had he not been killed. That charge is error and misled the jury. The loss of his society and of his aid in her support is the direct consequence of his death. Under the law as it existed when he was killed, such damages are not recoverable. The verdict lumps the damages, and we cannot know what portion was given for the recoverable cause and what portion for the unrecoverable, and we must therefore assess them ourselves. The death was immediate, if not instantaneous. The unfortunate man was precipitated, with the engine, 90 feet. His forehead was cut, and, if he survived the blow upon his head, his death by drowning followed quickly. No arithmetical calculation can compute the intensity of that agony that overwhelms the victim of such an accident when he confronts death; but a sum has to be adopted, and its apportionment to the duration and intensity of the suffering is not determinable by fixed rules. What was endured is unknown and unknowable; but it is safe to conclude that the jury gave the larger part of their verdict for the loss of support and the laceration of the mother’s heart by the horrible death of her young and only son. These elements must be eliminated, and we shall reduce the judgment.” Van Amburg v. Railroad Co., 37 La. Ann. 651, 653, 654, 55 Am. Rep. 517.
We have thus quoted, somewhat in ex-tenso, from the case cited for the purpose of showing that, from the moment that the law, giving to certain survivors a right of action, on their own account, for damages resulting to them from the death of a relative, was first brought to its attention, this court has regarded damages resulting from injury to feelings as recoverable under it, equally with those resulting from injury to the person, or to the purse. Now, it is true that it has always been held, and is the rule *991 now, that, so long as the person receiving an injury and the person by whom it was inflicted live, the action for the recovery of •damages is so far personal that those resulting from injury to feelings can be recovered only by the person upon whom the injury was inflicted, though a third person may recover damages otherwise resulting to him from such injury. Thus, in a case decided in 1855 it appears that a boy was badly crippled through the negligence of the defendant, and that his father brought suit for damages alleged to have been sustained by himself claiming nothing on account of the boy. Only four of the judges participated in the decision (Spofford, J., taking no part), and Buchanan, X, as the organ of the court, held that, under paragraph 3 of article 1928 (now 1934) of the Civil Code, which declares that, in the assessment of damages, in cases of offenses, quasi offenses, and quasi contracts, much discretion is left to the judge or jury, plaintiff might recover the expenses incurred by him for medical and surgical attendance and nursing and for loss resulting from neglect of his business during his son’s illness, and that the jury could also take into consideration the prospect of further loss to him arising from his son’s crippled condition, which was likely to render him a burden during a period when he might otherwise be earning his own livelihood or assisting his father. It was further held, however, that the solicitude, anxiety, and anguish of the parents, on account of the “mutilation of a healthy and promising boy,” could not be taken into account, because to do so would be to inflict vindictive damages, in a case which did not justify such action, though it was said that the case would be different had the suit been prosecuted in behalf of the sufferer himself.
Slidell, C. J.,